# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF STEPHEN E. CRAWLEY; NORMA CRAWLEY, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO THE ESTATE OF STEPHEN E. CRAWLEY; AND JOHNNY CRAWLEY, INDIVIDUALLY, | Case No. 1:13-CV-02042-LJO-SAB |
| | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. |
| Plaintiffs, | |
| v. | (Doc. 69) |
| SHAWN MCRAE, INDIVIDUALLY; MARIUS BARSTECEANU, INDIVIDUALLY; AND, DOES 1-50, INCLUSIVE, | |
| Defendants. | |

This case arises from the officer-involved fatal shooting of Stephen E. Crawley. Plaintiffs bring the instant civil rights action against the arresting officers, alleging excessive force under 42 U.S.C. § 1983 and state law causes of action for civil rights violations and battery. Before the Court in the above-styled and numbered cause of action is Defendants Shawn McRae, as Sergeant for Kings County Sheriff's, and Marius Barsteceanu, as Senior Deputy for Kings County Sheriff's (together, "Defendants") Motion for Summary Judgment or Alternatively Summary Adjudication, filed June 26, 2015 (Doc. 69). Plaintiffs Estate of Stephen E. Crawley, Norma Crawley, and Johnny Crawley (collectively, "Plaintiffs") filed their Opposition on July 20, 2015 (Doc. 73), and Defendants filed their Reply on July 27, 2015 (Doc. 81). The Court deems the matter appropriate for resolution without oral argument. *See* Local Rule 230(g). Having carefully considered the record in this case, the parties' briefing, and the relevant law, the Court grants in part and deny in part Defendants' motion. The Court finds that there are triable issues of fact as to whether the officers' actions were reasonable, and these triable issues impact whether the officers are entitled to qualified immunity.

**BACKGROUND**

## I.   FACTUAL ALLEGATIONS

The following relevant facts come primarily from Plaintiffs' Second Amended Complaint ("SAC," Doc. 30); the parties' Joint Statement of Undisputed Material Facts ("UMF," Doc. 69-2); Defendants' Separate Statement of Undisputed Material Facts ("DSSUMF," Doc. 69-3); Plaintiffs' Statement of Disputed Facts ("SDF," Doc. 76); video evidence of a police interview with Johnny Crawley (Doc. 69-9, Ex. 2), Norma Crawley's Declaration (Doc. 30-1) and Deposition (Doc. 79-1); William L. Schmidt's Declaration ("Schmidt Decl.," Doc. 77); the depositions of relevant Sheriff's deputies, including Marius Barsteceanu, Shawn McRae, Leonel Alvarez, Jennifer Machado, Chris Jackson, Michael Kendall, Brian Monteiro, Peter Thompson, Rachel Ortiz, and Nate Scott ("Barst. Depo.," Doc. 78-5; "McRae Depo.," Doc. 79-5; "Alvarez Depo.," Doc. 78-4; "Machado Depo.," Doc. 79-4; "Jackson Depo.," Doc. 79-2; "Kendall Depo.," Doc. 79-3; "Montiero Depo.," Doc. 79-7; "Scott Depo.," Doc. 79-9), as well as some officers' declarations ("McRae Decl.," "Barst. Decl.," "Alvarez Decl.," "Machado Decl.," "Jackson Decl.," "Thompson Decl.," and "Ortiz Decl.") (Docs. 69-4 through 69-10), the police dispatch's CAD Call Information (Doc. 69-10, Ex. 1), a police expert report (Doc. 78-3, Ex. 4), witness James Profet's deposition ("Profet Depo.," Doc. 79-8), Barsteceanu's Response to Interrogatories, Set One (Doc. 78-7), the toxicology report on Stephen Crawley ("the Toxicology Report," Doc. 78-2), as well as the Kings County Sheriff's Department Offense Report ("KCSD Offense Report," Docs. 87-1 & 2).

On August 14, 2015, Defendants filed objections to Plaintiffs' supplemental filings (Docs. 88-94), including the full transcripts of the relevant officers' depositions and a copy of the full CAD Call Information (*see also* Doc. 69-10, Ex. 10), rather than the previously filed excerpts. Defendants argue that they have not had an adequate opportunity to respond to information in the transcripts. However, the Court finds that by filing these full copies Plaintiffs present no new arguments. Moreover, Defendants' counsel was present at each of the depositions, Defendants had access to each of these documents prior to filing their motion, and the source of the information is either from officers known to Defendants, or Defendants themselves. Additionally, the Court finds filing copies of depositions in their entirety is required under Local Rule 133(j).

The nature of a fatal officer-involved shooting is that the decedent cannot testify. In such circumstances, precedent permits the decedent's account to be constructed, circumstantially, from inconsistencies in the officers' testimony. The Ninth Circuit makes plain:

> In cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before a shooting has died, our precedent permits the decedent's version of events to be constructed circumstantially from competent expert and physical evidence, as well as from inconsistencies in the testimony of law enforcement.

*George v. Morris*, 736 F.3d 829, 834-35 (9th Cir. 2013) (citing *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994); *Santos v. Gates,* 287 F.3d 846, 852 (9th Cir. 2002) ("Nowhere in our cases have we held that police misconduct may be proved only through direct evidence.")). To that end, this Court applies the same principle. In their objections Defendants specifically ask the Court to thoroughly review the facts, and this the Court endeavors to do. For the foregoing reasons, Defendants' objections are **OVERRULED**. The parties may address evidentiary issues in pre-trial motions.

### A.  <u>The Parties</u>

Plaintiff Norma Crawley ("Mrs. Crawley") is the mother of decedent Stephen E. Crawley[1] ("Stephen" or "the Decedent"), who died at Adventist Medical Center in Hanford, California, on November 17, 2012. Mrs. Crawley sues in her individual capacity and as the successor in interest of the Estate of Stephen E. Crawley, pursuant to Section 377.11 of the California Code of Civil Procedure, alleging federal and state law violations and seeks general, special, compensatory, and punitive damages.

Plaintiff Johnny Crawley ("Johnny") is the Decedent's surviving brother. Johnny sues in his individual capacity.

Plaintiff the Estate of Stephen E. Crawley ("the Estate") is represented by and through Mrs. Crawley as successor in interest to the Estate. Plaintiffs represent that no proceeding is now pending in the State of California for administration of the Estate, and that the Decedent has no surviving spouse, domestic partner, children, or issue of deceased children that would be entitled to the property of the Decedent by intestate succession.

*//*

---

[1] Meaning no disrespect, the Court hereinafter refers to brothers Stephen Crawley and Johnny Crawley by their first names, for clarity.

Defendants Marius Barsteceanu ("Barsteceanu") and Shawn McRae ("McRae") are sued in their individual capacities. At all relevant times, Barsteceanu was a Senior Deputy and McRae a Sergeant for the Kings County Sheriff's Department. Defendants Does 1-50 remain unnamed.

## B. Video Account and Photographic Evidence

There is no video of the subject incident. However, Defendants submitted a video recorded during a King's County Sherriff's Department ("KCSD") interview with Johnny Crawley, who from the perspective of the camera was seated in a chair next to a desk while being interviewed by two detectives seated at the desk. Defs. Lodged Exhibit (Thompson Decl.) (Doc. 69-9, Ex. 2). Defendants also lodged a transcript of the interview. (Doc. 69-9, Ex. 1). In the interview, Johnny gives his account of the events leading to the alleged assault against him by his brother, Stephen, as well as his account of his interactions with law enforcement during the subject incident. According to Johnny, when Stephen swung a golf club at him, Johnny thought Stephen was trying to kill him. Thompson Dec. ¶ 3, Ex. 1, at 120, 141. When asked why, Johnny responded that Stephen had "problems" and "something wrong." *Id.* at 120. In support of their motion, Defendants also filed photographic evidence taken in November 2012, including exterior and interior photographs of the Crawley Residence. An interior photograph shows a chair, to the right of which is a walker. (Ex. 6). Exterior photographs show the rear, north side of the home had one back door and one set of windows. The photographs also show that there are two steps from the house's front yard to its wide front porch, approximately six feet deep. Along the front stretch of the porch stands the front door (to the extreme left), and to its right is one window. The covered porch is L-shaped, stopping immediately to the left of the front door, extending to the right the length of the house, then turning the corner. There appears to be air conditioning equipment and one window on the east side of the house.

## C. Plaintiffs' Undisputed Account of the Alleged Assault by Stephen against Johnny[2]

Brothers Stephen and Johnny Crawley, both adult males in their 50s, lived at a house near Hanford together with their mother, Mrs. Crawley. *See* SAC ¶ 16. On the morning of November 17,

---

[2] These facts are generally undisputed, and Defendants' lodged exhibit, the video interview with Johnny, repeats much of this information. *See* Doc. 69-9, Ex. 2.

2012, around 11 a.m., Mrs. Crawley left for the grocery store taking with her the only telephone, and leaving the adult brothers at the house. *Id.* ¶ 17, 19. Johnny was watching television in his room and noticed that Stephen was "acting odd." *Id.* ¶ 17. Stephen was pacing and muttering to himself. Stephen "had been sick with the flu for the past couple of days." *Id.* ¶ 17. Johnny ignored Stephen, but his behavior became increasingly erratic. *Id.* ¶ 18. Stephen was muttering to himself, "you're gonna lose, you're gonna … I'm gonna come, come after you." *Id.* Stephen began to hit the floor with the golf club outside Johnny's bedroom door. *Id.* Not wanting to provoke him, Johnny left the residence, leaving Stephen alone in the house. *Id.* Johnny rode his bike to a nearby neighbor and asked them to call the police to report Stephen's behavior, "hoping to be able to peacefully reenter the shared residence." *Id.* ¶ 19.

The Court hereinafter refers to Stephen's conduct against Johnny as "the alleged assault."

### D. <u>Events Leading to Encounter Between Stephen Crawley and Law Enforcement</u>

James Profet ("Profet"), the Crawleys' neighbor, called 911 on Johnny's behalf at approximately 11:54 a.m. (JSUMF 1, 3), and told the operator that Johnny had asked him to call because his brother had a golf club and was inside their shared residence "going crazy." SDF Nos. 1, 2. At 11:56 a.m., officers[3] were dispatched to the Crawley residence at Kansas Avenue and 13th, and told over the radio[4] that an individual at the house with a golf club going crazy. *Jackson Depo.* 24:10-13; *Kendall Depo.* 32:5-8; *McRae Depo.* 61:23-25; *Barst. Depo.* 68:4-6, 19-21; Ortiz Dec. ¶3; Ex. 1 at p. 209.

*Deputy Alvarez's Initial Investigation (12:01 p.m.)*

Deputy Alvarez arrived first, at 12:01 p.m. By that time, the alleged assault had concluded and Johnny was outside alone in the front yard. JSUMF 1, 3. Alvarez learned from Johnny that the situation involved an alleged assault with a deadly weapon on Johnny by his brother Stephen. *Alvarez Depo.* 26:19-25; SDF No. 3; *see* Cal. Pen. Code § 245. During this initial interview, Johnny told Alvarez that his brother, Stephen, was the only person inside the residence, that there were no

---

[3] The majority of the law enforcement officers involved were deputies with the KCSD, though of various ranks, and one responder was a police officer. The Court hereinafter refers to the collective group as "officers."
[4] It is undisputed that the information officers learned about the incident while en route, they got from the radio traffic between Dispatch and other law enforcement officers. *Jackson Depo.* 25:21-24. At least one officer testified that the radio transmissions were fairly clear. *Jackson Depo.* 26:4-11.

other weapons except for the golf club in the house, that Stephen was not using or under the influence of any drugs or alcohol at that time, that Stephen was not on drugs but that Johnny believed Stephen was under a "spell." *Alvarez Depo.* 40:21-23; SDF No. 4. On the basis of his conversation with Johnny, Alvarez believed he had reason to detain Stephen for the alleged assault. *Id.* at 24:23-25-25:1; *see* Cal. Pen. Code § 245. Before Alvarez approached the house in an effort to make contact with Stephen, Alvarez instructed Johnny to stay back by the patrol vehicle, away from the house, and Johnny complied. *Id.* at 41:14-18.

Deputy Alvarez tried to make contact with Stephen, but Stephen did not respond verbally, he only briefly appeared at and tapped on the front window. SDF 6. Although not directing his words at Alvarez, Alvarez heard Stephen mutter, almost incomprehensibly, something to the effect of "break bones" or "break the bones." SDF 6. Alvarez quickly gave up trying to contact Stephen. SDF 7-9. Alvarez identified no evidence indicating that anyone's, including Stephen's, life or safety was in imminent danger, or that Stephen was a flight risk. *Alvarez Depo.* 28:24-25; 43:1-4; 43:22-44:4. Alvarez concluded that this was a barricade situation. *Id.* at 24:1-3; 25:13-23. Subsequent to his failed attempt to communicate with Stephen, Alvarez took no immediate action and felt no rush to do so. *Id.* 28:24-25; 43:1-4, 43:22-25; 44:1-4.

After the brief encounter with Stephen, Alvarez walked back to his car, where Johnny was, and waited for backup. *Id.* Via radio, Alvarez contacted backup officers and requested that responding deputies bring less-than-lethal equipment to the scene. SDF 10, 11. Deputy Alvarez also provided an update over the radio to Senior Deputy Machado, who was en route. SDF 7. Deputy Alvarez told her that he did not have "too much in fine detail but I had enough to know that, there's a person inside with [inaudible] golf club and . . . uh . . . I could obviously hear banging noises. Um . . . I knew nobody else was inside, s… so it was a [inaudible] to try and rescue anybody in there." SDF 7. Alvarez waited by his police cruiser with Johnny for the other deputies to arrive. SDF 10, 11. It is undisputed that a number of KCSD personnel were dispatched to the house, including Sergeant McRae; Deputy Barsteceanu and his partner, Lemoore Police Officer Michael Kendall; Deputy Leonel Alvarez; Deputy Brian Monteiro; Deputy Nathaniel Scott; Senior Deputy Jennifer Machado, and Deputy Chris Jackson. JSUMF No. 8.

*Officers' Accounts of Backup en Route*

Responding officers en route heard from an officer at the scene that Johnny alleged that he had been attacked by his brother, Stephen, with a golf club, that nobody else was inside the house, and other than the golf club that there were no weapons inside. *Jackson Depo.* 63:20-25; *McRae Depo.* 65:8-11, 21-23; 137:1-5; *Barst. Depo.* 70:6-10. Responding officers heard Alvarez ask over the radio if any officer could respond with less-lethal equipment, specifically a less-than-lethal "bean bag" shotgun. *Jackson Depo.* 24:24-17; *Kendall Depo.* 30:9-11; *McRae Depo.* 39:17-19; *Barst. Depo.* 68:1-6. Jackson was carrying such a "bean bag" shotgun. *Jackson Depo.* 24:16-20. A "bean bag" shotgun refers to the kind of drag-stabilized bean bag rounds that the shotgun uses as projectiles, rather than bullets. *Id.* 24:21-25. An officer at the scene shared over the radio that the situation may be an "H&S" (that is to say drug-related to Health & Safety codes) or mental health issue, and Machado and other officers learned over radio from Dispatch that Stephen Crawley had no history of prior involuntary psychiatric holds (*i.e.*, Cal. W&I §5150). KCSD Offense Rpt. at 222; *Jackson Depo.* 27:1-3; *McRae Depo.* 136:11-23. From the scene, Deputy Machado requested both Stephen and Johnny's criminal histories over the radio. *McRae Depo.* 138:5-9; *Barst. Depo.* 72:6-10, 24-25. Machado asked for this information approximately five minutes before, or "relatively pretty close," to the time of the shooting. *McRae Depo.* 138:10-13.

When Sergeant McRae first heard the call from dispatch he was at his office, then drove "Code 3" to the scene alone in his patrol unit.[5] *McRae Depo.* 59:14-20. It took McRae five to seven minutes to get to the scene. *Id.* 66:1. McRae heard Machado say she was "Code 4."[6] *Id.* 136:24-25; 137:1-7.

On the date of the incident, Deputy Barsteceanu was partnered with Officer Kendall and they rode together in a marked Lemoore Police Department vehicle. *Barst. Depo.* 50:2-4; *Kendall Depo.* 35:5-6. The partners were at lunch when they heard Dispatch put out the call. *Id.* 67:9-17. The partners had a short conversation about whether they wanted to go on the call. *Kendall Depo.* 30:12-14. They decided to respond because Kendall had a K-9, considered a less-than-lethal force

---

[5] McRae defined "Code 3" as driving above the speed limit absent use of the patrol vehicle's lights. *McRae Depo.* 62:23-25; 63:1-2.

[6] For the purposes of this motion, the Court will use the officers' definition of "Code 4," that is to say, a "unit is okay." *Barst. Depo.* 63:20.

option, relevant to Alvarez's request. *Id.* 69:3-11. Barsteceanu assumed that they were responding to a call related to a family with which he was familiar. *Barst. Depo.* 74:10-12. From Barsteceanu's prior interactions, he recognized Johnny's name. *Id.* 1-4. He believed that Johnny was known for narcotics violations, prior assaults, and violence, and therefore believed Johnny was the suspect. *Id.* 71:5-9, 13-17. Barsteceanu testified that he told Kendall that he knew Johnny was violent. *Barst. Depo.* 71:10-12. Kendall testified that he did not recall any conversation in the car about Barsteceanu's prior knowledge of the Crawleys. *Kendall Depo. 32:20-24.*

*Officers' Accounts of Arriving and Early Investigation (12:01 – 12:17 p.m.)*

Deputy Monteiro arrived next and covered the house's front door while Alvarez continued interviewing Johnny. *Alvarez Depo.* 42:24-25; 44:8-10. According to Alvarez, Johnny's agitated state and repetitiveness made it difficult to get additional information from him. SDF No. 9. Johnny did not say whether Stephen swung a golf club at him, but told Alvarez that he was going to need more men, and that Stephen would "come at him" if Alvarez opened the front door; he asked Alvarez not to open it. SDF No. 8; *Alvarez Depo.* at 40:11-16.

Between 12:04-06 p.m., Deputies Scott, Machado, and Jackson arrived in quick succession. CAD Call Info. at p. 2 (Scott arrived 12:01); *Alvarez Depo.* at 44:15-22; *Machado Depo.* at 19:22-25-20:1-7 (arrived 12:06); *Jackson Depo.* 28:20-23; 29:5-7; 31:1-3, 12-14; 37:2-7 (arrived 12:06). When Jackson arrived, several patrol cars were already parked at the scene, (*Jackson Depo.* 31:1-3), and he observed an officer next to a patrol car standing with Johnny. *Jackson Depo.* 36:1-6. Other officers formed a perimeter around the house. *Id.* 32:8-10.

Now considered the senior deputy in command of the scene, Machado contacted Alvarez, still speaking with Johnny. *Machado Depo.* at 19:4-6, 11-13. Alvarez briefed Machado and Jackson (*Jackson Depo.* 32:10-11), then observed Machado's interview with Johnny. *Alvarez Depo.* 44:20-25. Machado asked Johnny what had happened, what was going on, and whether anybody else was in the house. *Alvarez Depo.* at 45:8-11. Deputies Machado and Jackson testified about their interviews with Johnny. According to Machado, Johnny reported that "his brother was going crazy. That he tried to kill him. He was swinging a golf club at him. And I remember Deputy Alvarez conveying, at that point, that Johnny had told him that we needed more people or something to that

extent." *Machado Depo.* 22:19-23. Johnny also told her that if officers went in the house that Stephen would come at them. *Id.*

Alvarez specifically testified that Machado's interview with Johnny yielded no information from Johnny that was new or contradictory to Alvarez's prior interview with Johnny (*Alvarez Depo.*45:8-11), and Jackson similarly testified that Johnny told him that the alleged assault involved his brother, Stephen, chasing him with a golf club, trying to hit him, trying to kill him, and that no guns were in the house. *Jackson Depo.* 37:15-25; 38:1; 41:17-18. Jackson observed that Johnny appeared shaken up and distraught. *Id.* 38:2-5. Johnny seemed to understand the interview questions, but appeared distracted. *Id.* 38:11-15.

Machado testified to a different account: "[a]t one point when questioning [Johnny] upon my initial arrival, I asked him if anyone else was in the home. And he said my mom." *Id.* 66:15-25. By Machado's account, she "asked them [Alvarez and Johnny] briefly what was going on. It became evident that a crime had occurred. And I felt it was important to move them back away from the house. So that's when we walked back towards the roadway." *Machado Depo.* 21:17-23. Machado told Alvarez to stay with Johnny and try to get more statements. *Id.*

*Officers' Accounts of Attempts to Contact the Suspect*

Leaving Alvarez with Johnny near the road and parked cars, Deputies Machado and Jackson went closer to the house where they planned to attempt to contact the suspect. *Machado Depo.* 22:18-22; *Jackson Depo.* 43:17-23. They knocked on the door and yelled out to whoever was inside. *Machado Depo.* 32:15-19; *Jackson Depo.* 32:11-12. There was no response and Machado heard no sound coming from the house. *Machado Depo.* 33:8-11; 34:3-9. The front window near the door was covered and they could not see any figures or shapes inside. *Id.* 33:6-11; *Jackson Depo.* 32:12-14. "That was about the time that Sergeant McRae arrived, and Senior Deputy Barsteceanu and Officer Kendall arrived," and they parked near the road. *Id.* 33:15-16; 22:9-12; *Jackson Depo.* 36:11-12; 43:18-21; *McRae Depo.* 66:6-10, 68:22-23.

According to McRae, he first spoke with Alvarez, still with Johnny near the road, and Alvarez briefed him. *McRae Depo.* 70:2-9, 19-25; 71:2-15. Believing that Johnny could help establish contact with Stephen, McRae brought Johnny close to the house and asked him to tell

9

Stephen everything is okay and to come out of the house. *Id.* 71:16-23. Meanwhile, Jackson focused on holding a perimeter at the front door of the house while he saw officers using Johnny to attempt contact. *Jackson Depo.* 43:6-13; 61:12-18. Defendants assert that when Johnny started yelling at the house the noise inside "ramped up," and McRae heard "full on" screaming, (*McRae Depo.* 71:24-25; 72:1), although Jackson did not recall any particular reaction in response to Johnny's efforts. *Jackson Depo.* 61:19-21. Defendants assert that McRae could not see Stephen, nor could he see any shadows or movement inside the house. *McRae Depo.* 72:2-5. Having concluded that using Johnny to communicate with his brother would not be fruitful, McRae brought Johnny back towards the road. *Id.* 72:6-10.

Trying another tack, McRae explained to officers that because he was a negotiator he was going to go closer to the house, alone, to try to talk to Stephen. *McRae Depo.* 72:24-25; 73:1-3. Alvarez also moved up towards the front of the house, and Monteiro stayed with Johnny. *Id.* 73:3-4. McRae went up to the front of the house and called out to Stephen, asking him what was going on. *Id.* 73:10-14, 19-20. McRae, with Jackson, moved around outside the house, and as they moved around they heard smashing, screaming, and sounds of violent actions coming from inside the house. *Id.* 76:13-15; *Jackson Depo.* 32:22-24.

Absent any visual, McRae moved around the house with Jackson and both tried to talk to Stephen through windows, with no response. *McRae Depo.* 75:19-22; 76:13-14; *Jackson Depo.* 32:19-24; 34:19-20. McRae knocked loudly on the windows and the walls and called out to Stephen. *Jackson Depo.* 34:23-25. Jackson circled the house numerous times, but Stephen never acknowledged him. *Id.* 33:1, 13-14; 34:10-14; 56:5-7. Jackson could not see inside, so he returned to the front and stayed there. *Jackson Depo.* 32:12-14. McRae never fully circled the house. *McRae Depo.* 93:6-8. Next, McRae went to the side of the house, called out to Stephen, and told him to calm down, saying something to the effect of "I'm your friend. Calm down. It's going to be alright. It's alright. We're here to help you," but he heard Stephen "still going." *McRae Depo.* 77:1-12.

*Officers' Various Accounts of Officers Arriving and Meeting*

According to McRae, Barsteceanu showed up at that point, accompanied by a Lemoore police officer with whom McRae was unfamiliar. *Id.* 73:5-6. Kendall and Barsteceanu parked

behind a KCSD vehicle and were the last to arrive. *Kendall Depo.* 34:20-25. Kendall left the K-9 in

the car (*id.* 36:22-23) and the partners found Deputy Machado. *Id.* 34:20-25. Once all the

responding deputies arrived, Alvarez went to the front of the house by the steps to the porch and

stayed there. *Alvarez Depo.* at 45:13-15.

According to Machado, she initially met three arriving officers (Kendall, Barsteceanu, and

McRae), and she briefed them as a group standing generally at the southeast corner of the home.

*Machado Depo.* 33:22-23; 34:13-18. After the briefing, Machado saw McRae walk around with

Barsteceanu, making multiple attempts to communicate with Stephen through the windows. *Id.*

37:5-7; 37:10-12; 55:16-18. After the group disbanded, Machado took up a position at the rear of

the Crawley Residence where she walked around, and stayed on the north side of the house away

from windows. *Id.* at 35:17; 36:6-7; *McRae Depo.* 72:13-17.

Kendall also testified that he and Barsteceanu were initially briefed by Machado (*Kendall*

*Depo.* 37:16-19), but that he did not recall where McRae was during this briefing. *Id.* 56:15-17.

Kendall returned to his patrol car where he removed his K-9 partner. *Kendall Depo.* 53:23-25.

Kendall moved to the front door of the residence, with his K-9 on-leash. *Id.* 48:14-19; 54:1-4. The

process of getting briefed, walking to his patrol car, getting the K-9, and walking to the front door

took approximately five minutes. *Id.* 54:5-6. Kendall did not take part in establishing a perimeter at

the house. *Id. 48:5-6.*

As the officers circled the house, the screaming from inside continued (*McRae Depo.* 88:4-

6), was largely incoherent, (*Jackson Depo.* 25:14-19; *McRae Depo.* 76:16-22), and some officers

never made out specific words. *Kendall Depo.* 47:12-21. Some officers testified that they could not

see Stephen moving around nor any shapes through the house's windows because of their

coverings. *McRae Depo.* 75:19-22; *Barst. Depo.* 91:6-8; *but see Jackson Depo.* 54:15-19; 55:1-2

(Jackson could "more or less" see through the front window and see Stephen, either moving around

or as a shape, noting that it had curtains but not blackout curtains). McRae saw window blinds

move, but did not at that point see Stephen through them. *McRae Depo.* 75:19-20.

Asked if while using his negotiating tactics to contact Stephen McRae found it appropriate

for multiple officers to do so simultaneously, McRae testified that "because I didn't want to have --

the last thing you want to do is have five people hitting the place, you have to have somebody, especially with negotiating. The channel is, you know, I am trying to offer you help." *Id.* 79:23-25; 80:1-9. McRae stated that "it can be more than one of the reassurance part. But I don't want – I didn't want to have somebody at the front of the house, and somebody over here, and over here." *McRae Depo.* 80:6-9. Barsteceanu, McRae, and Machado made significantly more attempts to contact Stephen than Jackson made. *Jackson Depo.* 56:16-19. McRae knew that Jackson had come around the house looking to see if he could see in, knocking on the house and saying something like "Sheriff's Office." *Id.* 80:10-12. While circling the house trying to contact Stephen, the various officers were animated and loud. *Jackson Depo.* 35:1-5; *McRae Depo* 79:15-16.

*Officers' Accounts of Barsteceanu's Actions Soon After Arrival*

It is undisputed that Barsteceanu arrived at approximately 12:17 p.m. According to Barsteceanu, he first met with McRae at the front of the residence (*Barst. Depo.* 85:3-4, 25; 87:16), during which he learned that the officers had identified a "possible victim," but "no hostage." *Id.* 44:8. Barsteceanu saw Deputies Machado and Scott posted at the rear of the house, Alvarez at the front, and Monteiro by parked patrol cars talking with Johnny. *Barst. Depo.* 86:1-3, 11-5. Officers had established at least a semi-perimeter in which Barsteceanu was not a participant. *Id.* 89:23-25; 90:1-2; 104:2-3.

Barsteceanu testified that he then left McRae at the front, and, alone, went to the back of the house, where he met with Deputies Machado and Scott. *Barst. Depo.* 88:18-20. During a meeting with the rear-posted deputies, Barsteceanu asked Machado and Scott if they could see or hear anything *Id.* Then, leaving the back of the house, he returned to where McRae was in the front, and then went around the house "a couple times," before again returning to the front. *Id.* 87:23-25; 88:1, 8-13. Barsteceanu later testified that after his first meeting in front with McRae, he left the front *with* McRae, and together they walked to where deputies were posted at the back of the house. *Id.* 93:18-20. In any event, after meeting with the rear-posted deputies, he and McRae walked around trying to look inside the house. *Barst. Depo.* 93:25; 94:1-2. As they did so, they banged on the windows and screamed out, saying things like "Hey Stephen," that they just wanted to talk, and

asking if he was okay. *Barst. Depo.* 94:5-8; 107:24-25; 108:1-4. Somebody opened the blinds "a couple times" but the officers couldn't see in. *McRae Depo.*80:12-14.

McRae could not get a good visual through any of the windows, until he came to the back of the house. *Id.* 80:22-24. As they went around the house, at first officers could not make out specific words. *Barst. Depo.* 92:12-14. Later while walking around the house, some officers could make out something to the effect of "break bones" or "break your bones," (*Barst. Depo.* 107:4-6) but no swear words and the yelling seemed random and intermittent (*McRae Depo.* 104:25); it would start and stop with periods of silence. *Jackson Depo.* 25:14-19; *Barst. Depo.* 92:18-19; *McRae Depo.* 75:17-18, 77:1; *Kendall Depo.* 47:12-21. Banging sounds also started, stopped, and repeated. *Barst. Depo.* 92:19-20. At some point, several officers also heard what they thought to be sounds of someone running in the house back and forth, back to front. *Machado Depo.* 54:21-25; 55:3-4; *Barst. Depo.* 106:14-17.

At some point, Barsteceanu asked for and got McRae's approval to speak with Johnny. *Barst. Depo.* 94:10-12. Barsteceanu was aware that other officers had already interviewed Johnny, and he had been briefed about what they learned from Johnny prior to Barsteceanu's arrival. *Id.* 99:21-25; 100:1-7. Barsteceanu discounted the prior interviews and wanted to interview Johnny himself because he had prior experience with the Crawleys and because "[t]hat whole shift was nothing but new people," and "there were a lot of deputies on scene that were just standing." *Id.* 98:20-25; 99:1-5; 100:12-13, 18-19.

Once back at the front, Barsteceanu spoke with Johnny. *Id.* 87:22-25. He interviewed Johnny by some of the parked patrol cars. *Barst. Depo.* 88:25; 89:1; *Jackson Depo.* 42:23-25; 43:1-5. During this conversation, Barsteceanu observed that Johnny was distraught. *Id.* 94:18-20; 132:14-15. Johnny again explained about the alleged assault (*id.* 94:20-23), said there were no guns involved (*id.* 146:1-3), and that Stephen would come after whoever came in the door (*id.* 143:13-18). Barsteceanu asked Johnny whether he wanted to prosecute his brother for assault, and Johnny replied that he did. *Id.* 101:6-7. Barsteceanu asked whether Johnny currently lived at the house and if officers could go in and arrest his brother, to which Johnny replied affirmatively, but suggested that he thought that to do so would require additional officers. *Id.* 101:7-10. Barsteceanu did not

observe any blood or bruising on Johnny, and Johnny said nothing about Stephen actually hitting him. *Id.* 95:2-5; 102:19-21. Barsteceanu testified that Johnny answered questions about whether his mother was home, but either did not know or was unsure. *Id.* 98:2-7. Barsteceanu believed Johnny's information was reliable and accurate. *Id.* 102:20-24. Based on Barsteceanu's historical experience with Stephen's mother, Mrs. Crawley, years before, he believed that she did not drive and appeared unable to walk. *Id.* 98:8-11. Barsteceanu concluded that Mrs. Crawley was presently in the house. *Id.* 98:8-11. At some point Barsteceanu told McRae about his deduction. *Id.* 98:12-14. When asked if anyone at the scene specifically told him that Mrs. Crawley was inside the house, Barsteceanu testified, "No." *Id.* 108:8-11.

After meeting with Johnny, Barsteceanu met with McRae again (*id.* 89:2-3, 89:18-22) to determine what was going on because he heard "some type of commotion" inside the residence and saw that Johnny was distraught (*id.* 90:10-14). Barsteceanu learned from McRae that they had "a 245," an alleged assault with a deadly weapon on Johnny by Stephen, that Stephen was inside the house armed with a metal golf club (*id.* 90:23-25; 91:1-4; 93:7-12); officers had been unable to make contact with Stephen or see inside through the windows (*id.* 91:3-5); and that officers were concerned because they could hear a male subject screaming and banging sounds (*id.* 92:2-12). McRae shared with Barsteceanu that Johnny told officers how Stephen would "come at them" if officers opened the door. *Id.* 93:8-12.

*Officers' Accounts of Seeing the Suspect through a Window*

At the back of the house for the second time, Barsteceanu and McRae were banging on the windows. *Barst. Depo.* 96:7-9. McRae testified that "we" came around back, where he pulled open the back door's screen door, and there he could see inside. *McRae Depo.* 81:14-16. The drapes were either open "a little bit" or McRae could see through them. *Id.* 81:17-18. Because the drapes were "a little" sheer, (*id.* 81:18-19), "that's when I finally got a look in at [Stephen]." *Id.* 81:19-20; *Machado Depo.* 38:10-13. Now with a visual, McRae stopped talking. *Id.* 81:21-22. Only McRae was looking in the window, but he noticed that Deputies Machado and Scott were nearby. *Id.* 82:6-7; 83:4-9. McRae was not touching the window glass and estimated that through it he stood

approximately a couple feet away from Stephen. *Id.* 85:1-2. When Stephen appeared in the window

the banging coming from inside stopped. *Barst. Depo.* 97:18-19.

Through the window McRae saw that Stephen held a golf club like a baseball bat. *Id.* 88:8-

12. McRae watched as Stephen was "pirouetting around," swinging the golf club around, hitting at

air. *Id.* 88:8-17. Seemingly in response to McRae banging on the door, Barsteceanu saw "a figure"

with big eyes in a small window but who said nothing. *Barst. Depo.* 96:9-15. Stephen moved from

McRae's sight, and "next thing I know is his face comes up in that window. I jumped back." *Id.*

88:19-21, 84:8-9; *Machado Depo.* 38:10-13. McRae thought Stephen looked "strange" because he

did nothing to acknowledge McRae through the window, and seemed to look "through" McRae.

*McRae Depo.* 88:22-25; 89:1-2. Barsteceanu heard McRae ask Stephen if he was okay. *Barst.*

*Depo.* 96:16-18. Stephen had something in his hand, and Barsteceanu thought it was a golf club. *Id.*

106:1-3. During this, McRae heard Stephen repetitively say something like "break bones." *McRae*

*Depo.* 84:3-7. McRae abruptly stood back, and when Stephen "darted off," McRae could not see

where he went. *Id.* 84:8-9. McRae testified that he watched Stephen through the window for about

ten seconds. *Id.* 86:19-20; 87:24-25. The incident was "very short." *Barst. Depo.* 96:23-25. McRae

backed up a bit and started saying something like, "Hey, it's me. Steve, it me. It's Shawn. It's your

pal." *McRae Depo.* 84:10-12. McRae did not see Stephen again until they breached the front door.

*Id.* 88:4-6. Barsteceanu neither saw blood on Stephen (*id.* 104:14-18), nor on the golf club (*id.*), nor

did he observe any evidence to support that Mrs. Crawley was in the house. *Id.* 104:20-24. Based

on what he saw of Stephen at the window, Barsteceanu concluded that Stephen could be under the

influence of drugs or suffering from mental illness. *Barst. Depo.* 106:6-11. Barsteceanu concluded,

based on what he saw through the window, that "[Stephen] was now okay." *Id.* 97:16-18.

Barsteceanu decided to stay at the back of the house since he had just seen Stephen there.

*Id.* 97:18-19. He told Deputies Machado and Scott to try to keep Stephen "back here. . . [t]ry to

keep him preoccupied." *Id.* 97:7-10. Barsteceanu did not give these offices any further instruction

and did not remember McRae doing so. *Id.* 97:12-16. After seeing Stephen through the window,

Barsteceanu talked to McRae "to the side." *Barst. Depo.* 97:21-23; *Machado Depo.* 66:15-25.

Barsteceanu concluded that "something was not right," the scene was not "making any sense,"

because Stephen was unwilling to engage or talk. *Id.* 106:11-13. Barsteceanu was concerned that

Stephen might potentially hurt himself (*id.* 109:6; 110:21-22), but testified that he had no direct

evidence that he would do so. *Id.* 109:3-11. Even so, Barsteceanu concluded that there was a "high

likelihood that either Miss Norma or [Stephen] was hurting himself [sic]." *Id.* 109:19-22.

Barsteceanu came to that conclusion based on Johnny's statement (earlier saying, "I don't think

mom is home [sic]") and because of Barsteceanu's prior knowledge of the Crawleys, specifically

his deduction made years prior that Mrs. Crawley was not very mobile. *Id.* 111:9-15.

*Officers' Accounts of Planning for the Breach*

According to Kendall, he understood from the *initial briefing* with Barsteceanu and

Machado that these officers intended to arrest Stephen for assault with a deadly weapon. *Kendall

Depo.* 37:2-3; 38:13-19. Someone mentioned that Mrs. Crawley was possibly in the house, but that

it was unknown at the time. *Id.* 38:21-24. Kendall knew of no specific evidence that Mrs. Crawley

was home. *Id.* 39:7-9. Kendall had not spoken to Johnny. *Id.* 42:16-17; 43:4-5. At this point, the

group (which included Barsteceanu, Kendall, and Machado), made a plan to enter the Crawley

residence. *Kendall Depo.* 54:11-22; 55:3-11. Kendall understood the plan to be that someone,

probably Machado, would attempt to keep Stephen at the rear of the residence "while we made

entry through the front door of the residence, the south side." *Id.* 54:24-25; 55:1-5, 13-16. Kendall

understood his role was to enter through the front door when it was breached. *Id.* 20-23. He would

be in the number two position, behind Barsteceanu. *Id.* 56:1-6. Kendall had no information that

Stephen was injured prior to the breach. *Id.* 52:15-17. A forced front-door entry was the only option

Kendall considered. *Id.* 60:4-6. He assumed that Mrs. Crawley was inside the residence. *Id.* 60:11-

12. Because Stephen had assaulted his brother and could possibly assault his mother, Kendall

believed Stephen or his mother's life could be in danger. *Id.* 63: 9-15.

Yet, according to Machado, during her initial briefing with the group (Barsteceanu,

Kendall, and McRae), they did not discuss breaching the front door. *Machado Depo.* 36:20-23. She

testified that she was not involved in the decision to breach the front door, and that no one

discussed breaching the house in her presence. *Id.* 40:18-20; 41:1-2; 44:17-19. However, she

testified that she knew officers had attempted, but failed, to get consent to enter the home. *Id.*

57:21-25. She also testified that she did not have a conversation with Barsteceanu or McRae at the back of the house, and did not specifically discuss whether Mrs. Crawley was present. *Id.* 67:1-7. After she observed Barsteceanu's meeting with McRae, she saw them leave the back of the house and return to the front. *Id.* 38:24-25; 39:1-9. She also testified that she knew that they were formulating a plan to breach the door but did not know specifically when they planned to do so. *Id.* 55:5-9. She was unaware of any other deputies' specific tactical roles in the breach. *Id.* 55:10-14. Before the breach, no one ever said anything to Machado about Stephen being injured. *Id.* 54:3-5. Machado did not see Stephen with a golf club in his hand before the breach. *Id.* 54:6-8. She considered the incident a barricade situation, but other officers speculated that it might be a hostage situation. *Id.* 61:1-5.

According to Jackson, he observed as McRae and Barsteceanu were formulating a plan and getting briefed. *Jackson Depo.* 43:21-23. And immediately after Barsteceanu and McRae got their initial briefing from someone, the group (which included  Barsteceanu, McRae, and Jackson) met in the front yard directly in front of the porch. *Id.* 43:24-25; 44:1-5. This was sometime after Jackson's attempts to contact Stephen, and McRae and Barsteceanu came up to him, one of them saying that "we need to make contact with [Stephen]. And that we were going to breach the door and hold." *Id.* 33:13-19. The group discussed that Stephen was going crazy inside and they did not know if anyone else was inside. *Id.* 44:7-9. Jackson first became aware during this conversation that the plan was to breach the door, stay outside and try to see if anybody else was inside the house. *Id.* 44:9-12. However, Jackson did not take part in the decision-making process. *Id.* 54:8-11. Jackson considered it a barricade situation. *Jackson Depo.* 42:16-18. Jackson had no direct evidence that anyone other than Stephen was in the house prior to the breach (*id.* 46:19-23), but concluded from Johnny's age that his mother would be elderly and infirm. *Id.* 47:2-21. Jackson heard someone say that Mrs. Crawley had trouble getting around. *Id.* 48:7-14. Jackson, who arrived before McRae and Barsteceanu, had no direct evidence that anyone's life or safety, including Stephen's, was in imminent danger. *Id.* 49:1-5. Jackson testified that, at some point, he came upon McRae near the back of the house and they talked about Stephen's behavior. *Id.* 85:13-25; 86:1. During that meeting, McRae noted Stephen's "hyper vigilant," bizarre behavior and concluded that he was "out

of his mind" and thought that he might "turn the house into a bomb." *McRae Depo.* 86:1-12.

According to McRae, after meeting up with Jackson near the back of the house, McRae decided to move around and see if he could look in from other locations. *Id.* 81:21-23. McRae moved back toward the front of the house. *Id.* 93:18-20. As he was walking around to the front, McRae met up with Barsteceanu and together *they* made the decision to breach the front door (*id.* 94:10-12), and Jackson "might have been standing there." *Id.* 94:22-25; 95:7-14. Kendall, the K-9 officer, was there at the front. *Id.* 95:19-20. The plan to breach was for Deputies Machado and Scott, positioned near the back of the house, to draw and keep Stephen back there. *Id.* 95:19-22. After the group met at the front about the plan, McRae watched Barsteceanu leave and go to the back of the house, then about 30 seconds later rejoin the group at the front. *Id.* 96:16-18; 105:13-17. McRae testified that during this time the plan developed thusly:

> I think it was Chris Jackson – give your less lethal. Leonel was there. I think Leonel had a taser. And then when – it just seemed like it was only a couple seconds they were there of we're going to kick the door open, but we're not going in. We are going to open it up and see if we can see him and see what's going on. Do we have – and one of the things [Barsteceanu] had said to me right here. I said to him: Well, what have we got? Do we have a 245? And [Barsteceanu]says, "Yeah, Johnny wants us to go in and get him."

*Id.* 96:19-25; 97:1-5; 98:21-4. McRae did not know whether Barsteceanu's comment implied an arrest or to "get him 5150'd [involuntarily committed for mental health evaluation]" *Id.* 99:1-2. McRae testified that in response he told Barsteceanu that regardless of what Johnny wanted, "[officers] are not going in. We are going to kick the door open and see what we can see." *Id.* 99:8-12. McRae never discussed getting a warrant. *Id.* 110:19-21. After Barsteceanu returned, the group talked about breaching the door. *Id.* 105:13-19. McRae and Barsteceanu decided that Barsteceanu would be "the kicker," but they did not discuss assigning duties to other deputies for the breach. *Id.* 100:24-25; 106:11-12. Later, McRae testified that "Chris Jackson had a less lethal shotgun. So he was going to be a cover man, as well as Leonel Alvarez. And I was going to be . . . the rear cover, and try and . . . move up with them in a covered position as well." *Id.* 106:14-17.

McRae also testified that the plan included what to do after the door was kicked down: "we were going to retreat back, because [the K-9] was just to our east, to allow us to try and fan out so we could see in and determine what tool we needed to use next. If we needed to use a tool next." *Id.*

18

106:18-21. They did not discuss sending the dog in as part of the plan. *Id.* 108:8-9. McRae testified that he did not think that he or anyone instructed Alvarez about his specific duty was in the breach. *Id.* 110:3-5. McRae considered that breaching the front door was superior to breaching the back door because he thought Stephen would be able to hide in a corner there, whereas the front door "provided a lot more area to make the best observation [sic]." *Id.* 132:18-24; 133:1. McRae testified that he considered breaching the front door superior to breaking a window in part because kicking the door open, "[officers] are going to get the best view, from floor to ceiling, and one shot into the house." *Id.* 109:4-6.

According to Barsteceanu, after speaking with Johnny, Barsteceanu went to McRae and told him what he had learned from that conversation. *Barst. Depo.* 132:16-20. Barsteceanu at no time discussed alternatives to breaching the front door. *Id.* 124:22-25; 125:1-2. Barsteceanu considered conditions at the scene a "rescue operation." *Id.* 122:1-2. He did not consider it a barricade or hostage situation. *Id.* 122:3-6. At some point, Barsteceanu told Deputies Machado and Scott, positioned at the northeast side, to distract Stephen at the back of the house by attempting to maintain verbal contact. *Id.* 125:8-10, 15-18; 128:19-21. Then McRae and Barsteceanu continued to try to contact "the person inside the house," with no success. *Id.* 132:22-24. The noises continued intermittently, would intensify, then stop. *Id.* 132:24-25.

It was at this point that Barsteceanu concluded that the officers needed to do something. *Barst. Depo.* 132:25; 133:1-4. Barsteceanu thought Mrs. Crawley was "getting killed," or Stephen was hurting himself. *Id.* 133:1-2. Barsteceanu concluded that officers needed to "get eyes inside the house," somehow. *Id.* 133:2-3. That is when Barsteceanu and McRae formulated the plan, Jackson either with them or nearby (*id.* 130:23-25), and then came to the front of the house. *Id.* 133:3-4. McRae agreed with Barsteceanu. *Id.* 128:5-6. The plan was to swing the door open, back up, and get a visual inside the house. *Id.* 127:23-25. According to Barsteceanu, he did not set an order of entry. *Id.* 138:21-24. Later he also testified that he and McRae made a specific plan and designated roles to the individual officers (*id.* 128:11-13): Scott and Machado would maintain their position and attempt to maintain contact with Stephen at the northeast corner (*id.* 128:15-17); Alvarez was already at the front of the house maintaining that location (*id. 128:*23-24); and Barsteceanu would

be the "breacher." *Id.* 129:6-7. Barsteceanu did not communicate with Alvarez about the plan. *Id.* 128:24-25; 129:1-2; *Alvarez Depo.* 51:23-25. McRae spoke with Jackson before the breach. *Id.* 129:15-16. Jackson already had a less lethal shotgun in his hand and came up to the porch. *Id.* 129:4-7. Barsteceanu also saw that Kendall had his dog out on a leash and that Monteiro remained with Johnny. *Id.* 129:17-19. According to Barsteceanu, he spoke with Kendall about what to do during the breach. *Id.* 130:1-3. He told Kendall to stay on stand-by with the leashed K-9, and he would call if needed. *Id.* 130:5-14. But when specifically asked whether he actually discussed the plan with Kendall, Barsteceanu testified that he discussed the plan in detail with <u>McRae</u>, "[a]nd I am pretty certain those people are around me when I was talking to him." *Id.* 134:23-25.

### Officers' Accounts of Their Primary Objective for the Breach

About whether the primary objective of their plan was to arrest Stephen for assaulting his brother, Kendall testified, "Absolutely." *Kendall Depo.* 61:24-25; 62:1.

Jackson understood that the primary objective of the plan was to determine whether anybody else was injured inside and to defuse the situation; and a secondary objective was to arrest Stephen for assault. *Jackson Depo.* 64:8-17.

Barsteceanu's primary objective for the plan was "a line of sight rescue," and his secondary purpose was to arrest Stephen. *Barst. Depo.* 138:3. Barsteceanu testified that he intended to arrest Stephen "at the end of the operation." *Id.* 101:11-12. Asked if at any point prior to the breach any of the officers were in immediate danger, Barsteceanu testified, "I didn't see any of them being in any immediate danger [sic]." *Id.* 138:19-20. Barsteceanu testified that he knew at the time that Johnny said no guns were in the house, but he did not know whether Stephen might have other weapons available because "residents tend to have at times knives and things of that nature." *Id.* 146:1-3.

According to McRae, he thought sufficient evidence existed to support that Stephen had committed assault with a deadly weapon, but the plan did not "in any way" include arresting or detaining Stephen. *McRae Depo.* 129:2-9. McRae considered the situation immediately prior to the breach imminently dangerous to the officers because of Stephen's state of mind, specifically, "he could turn on the gas, blow us all up. There is no cover around [the house]. The man is clearly out of his mind and capable of anything." *Id.* 100:4-9. McRae further testified that he though Stephen

"could jump out the window and attack somebody. It's -- that's bizarre behavior. I am a firm believer in if he wants to stay in there and break things, but his inability to even communicate and be so far gone, puts it past somebody just sitting in the house and saying: Hey, F-off, you can't come in my house." *Id.* 100:11-16. McRae considered Stephen could be an individual in meth psychosis or mental illness that made him a danger to himself because of his approximately 30 minutes of "excited delirium." *Id.* 102:16-18. McRae "didn't think much about" Mrs. Crawley as a factor because "the car was not there." *Id.* 101:11-12. McRae did not see or find evidence at the scene that anyone other than Stephen was inside the house. *Id.* 128:22-25.

*Breach of the Crawley Residence (Approximately 12:20 – 12:24 p.m.)*

At 12:07:49 p.m., 12:14:00 p.m., and 12:20:01 p.m., Dispatch records show that responding units at the Crawley Residence on Kansas were "Code 4." CAD Call Info., Docs.69-10, 88-1 at p.2.

According to McRae, after Barsteceanu returned to the front of the house and McRae had a conversation with him, then "we [got] with Jackson and Alvarez and we had the K-9 and we ended up approaching the front of the house." *McRae Depo.* 105:13-21. The group waited to breach until a time they felt Stephen was at the back of the house. *Id.* 131:19-21. Barsteceanu was tasked with relaying the message that the deputies positioned at the back of the house should distract Stephen. *Id.* 132:3-7. Before the group approached the front door, McRae could hear Stephen at the back of the house, and "that's when we approached and [Barsteceanu] just kicked the door." *Id.* 131:19-22. McRae testified that the goal was to "gain that distance so that we would have time to assess what was going on, and so we weren't trying to kick the door open and he would be in the front room right there." *Id.* 131:22-25.

According to Jackson, he knew that Machado was out back still trying to make contact with Stephen. *Jackson Depo.* 57:17-18. Immediately prior to the breach, Jackson did not think that officers were in any imminent danger. *Id.* 60:23-25; 61:1-3. Officers did not have Stephen's consent for officers to enter the house. *Id.* 74:3. Jackson does not remember discussing using less-lethal force. *Id.*57:23-25. Immediately prior to the breach, Barsteceanu walked up to Jackson "and said we need to breach the door and make contact with [Stephen], check to see if anybody else was inside. [Barsteceanu] walked up and I just, immediately, because of our training and experience

working together, took a position just on his right as close as I could get with less lethal." *Id.* 71:12-17. No one relayed to Jackson specifically where to stand in preparation for the breach; "it was just training and habit." *Id.* 71:5-7. Other officers were not given a specific tactical role. *Id.* 60:1-5.

Barsteceanu testified that after forming the plan, he took up a position to breach the front door, standing in front of it. *Barst. Depo.* 133:7-9; *Jackson Depo.* 84:18-21. Jackson stood to Barsteceanu's immediate right, "holding less lethal." *Id.* 133:16; *Jackson Depo.* 83:7-10. McRae was standing "by" Jackson (*id.* 133:17), but perhaps behind him (*Jackson Depo.* 85:7-8). Alvarez stood to Barsteceanu's left, holding the screen door open (*Barst. Depo.* 133:13-15), or the door stood open. *Jackson Depo.* 84:5-17. According to Barsteceanu, Kendall was off the porch, with his K-9 on a leash (*Barst. Depo.* 133:18-21), behind Barsteceanu and offset to the right. *Kendall Depo.* 56:8-10.

It took Barsteceanu three to five kicks to get the door open. *Barst. Depo.* 71:19-21; 86:3-6; 133:12;138:25; 139:1-2; *McRae Depo.* 134:5-6. According to Alvarez, he was surprised when Barsteceanu came up and started kicking the door. *Alvarez Depo.* 50:22-25; 51:1. As Barsteceanu kicked the door, "Kimo" started barking (*Kendall Depo.* 49:24-25; 50:1-5), and Kendall heard someone inside screaming and banging. *Id.* 50:6-11. Jackson remained at Barsteceanu's right side after he kicked open the door. *Jackson Depo.* 86:23-24. About whether Barsteceanu breached the door with his handgun drawn in ready-position, Jackson testified, "He breached the door with a lethal weapon because, like I said, that is the – our safety is first and foremost. So that's the reason we carry guns." *Jackson Depo.* 65:8-10. In the KCSD Offense Report, Jackson answered "yes" when asked if Barsteceanu entered with his gun drawn. *See* Doc. 87-2 (KCSD Offense Report), at p. 179. He later testified that he did not remember whether Barsteceanu had his gun drawn during the breach. *Jackson Depo.* 90:21-22. In contrast, Barsteceanu testified that "[w]hen I was in front of the door, I didn't have nothing in my hand." *Barst. Depo.* 134:3-4. About whether he had the gun to his side, he testified, "I don't think so." *Id.* 134:9.

From her position generally on the north side of the house, Machado did not see the breach team forcibly enter the front door of the Crawley Residence. *Id.* 58:20-25.

//

*Officers' Account of the Use of Force*

After kicking open the door, Barsteceanu saw Stephen was approximately 15-20 feet away. *Barst. Depo.* 139:12-14. Barsteceanu did not step into the house when the door opened but was a little bit back from the threshold. *Jackson Depo.* 86:12. Barsteceanu testified that there is a "high likelihood" that when the door opened he stepped into the house. *Barst. Depo.* 139:5-6. When the door opened, "there wasn't a pile up . . . but . . . there was a funnel of people right there." *McRae Depo.* 142:17-19. Some officers saw Stephen inside. *Kendall Depo.* 44:14-15, 17-21. From his position outside Kendall saw someone running inside the house. *Id.* 44:24-25. Standing behind Barsteceanu, McRae, because he is taller, saw into the house. *McRae Depo.* 132:7-8; 142:1-7. Jackson saw Stephen standing inside the house near an interior arch, which apparently separated the kitchen and living room near the back of the house. *Jackson Depo.* 87:7-11; *Alvarez Depo.* 53:12-24. Alvarez from his position on the porch steps could not see what was in front of Barsteceanu. *Id.* 54:12-24.

Barsteceanu observed that Stephen held a metal golf club raised "above his shoulder height," and heard Stephen say "break bones," or "I will break your bones," then Stephen "just took off like a full sprint." *Barst. Depo.* 140:17-22. Stephen took "a couple seconds" to close the distance between them. *Id.* 140:9-10. Stephen cocked the golf club up and started coming at a "full sprint" (*McRae Depo.* 132:7-8; 142:1-7), while Barsteceanu shouted for Stephen to stop. *Jackson Depo.* 86:12-15. Barsteceanu had time to pull his service weapon, and two or three times scream for Stephen to drop the golf club. *Barst. Depo.* 140:12-17; *Jackson Depo.* 86: 20-21. Warning Stephen, Barsteceanu said something to the effect of "drop the club. Stop. Stop. . . ." and then Jackson heard shots. *Jackson Depo.* 90:14-17; *McRae Depo.* 142:5-9. Jackson observed that Stephen did not stop and showed no indication that he was going to comply with Barsteceanu's instructions. *Jackson Depo.* 90:18-20. Barsteceanu had "very few" seconds to react. *Id.* 90:12-14. When Stephen "got about halfway in the living room," Barsteceanu fired shots. *Id.* 86:14-15. McRae saw Barsteceanu fire two or three shots. *McRae Depo.* 142:5-9, 19-21. When Stephen was almost at the door, McRae saw the gunshots hit him and he "collapsed back." *McRae Depo.* 142:12-13. Jackson testified that Stephen fell where he was shot. *Jackson Depo.* 89:2-3. From her position out back, Machado heard

23

shots fired approximately 30 seconds after McRae and Barsteceanu last left her at the north side of the house. *Machado Depo.* 39:10-15. Alvarez saw Barsteceanu fire the gun, but could not see inside the house. *Alvarez Depo.* 53:12-24.

After Barsteceanu fired his gun, Jackson assumed that Stephen had been shot because he went down. *Jackson Depo.* 89:8-11. Jackson did not know whether Stephen may perhaps had just been grazed because he saw Stephen lying on his left side, right arm at his side, with his hand still on the golf club seemingly trying to rock his body up while holding something else in his hand. *Id.* 89:8-11, 91:18-20; 92:8-15. As Stephen seemed to be moving to "rock up" and was yelling, Jackson's impression was that he would keep coming, so Jackson shifted his position a little bit towards the door to accommodate the shotgun, took half a step and shot Stephen twice with the less-lethal shotgun. *Id.* 91:9-14; 92:17-22; *McRae Depo.* 142:12-16, 23-25; 143:1-2.

Jackson testified that "when I fired my rounds, I actually stepped what would have been in front of [Barsteceanu]. We were still side by side, but he's on – at the extreme left side of the door, and I had to step in order to come around with the longer shotgun." *Jackson Depo.* 92:23-25; 93:1-4. Stephen was still resisting. *McRae Depo.* 143:1-2. Alvarez did not see Stephen when the less-lethal bean bag shots were fired. *Alvarez Depo.* 54:12-17. Deputies Jackson and Alvarez ran over to Stephen, grabbed and held him. *McRae Depo.* 143:2-3. Stephen was down but Jackson saw that he was still trying to get up, so "we held him down" with the weight of their bodies. *Jackson Depo.* 93:6-8. When Jackson went to grab Stephen's arm to handcuff him, Jackson realized Stephen's right arm was broken. *Jackson Depo.* 93:8-9. McRae saw that Stephen had been hit and was bleeding. *McRae Depo.* 143:3-6. Because there was no way to safely or effectively handcuff him, Jackson put direct pressure on Stephen's shoulders to keep him down while he "[fought] like a mad man." *Jackson Depo.* 93:9-13; *Machado Depo.* 40:10-15. Very soon after, Deputy Alvarez came in the house, joining Jackson and Barsteceanu. *Alvarez Depo.* 93:15-18. Once in the house, Alvarez observed that Stephen had fallen down next to a recliner chair. *Alvarez Depo.* 56:10-12. Officers requested an ambulance, got a trauma kit from one of the cars, and started putting pressure on Stephen's wounds. *Id.* 93:19-22.

//

McRae stepped outside and called in "shots fired, one down." *McRae Depo.* 144:11-13. Dispatch acknowledged shots fired at 12:24:38 p.m. *See* Doc. 87-2, at 215. Officers later identified that Stephen had been holding in his hand a piece of Styrofoam from a Cup O' Noodles. *Id. at 208; Alvarez Depo.* 91:18-20.

From her post at the back of the house, Machado did not see the deputies breach the front door, nor did she see the scene at the front of the house when the shots were fired. *Machado Depo.* 40:6-15. Immediately upon hearing shots fired, Machado ran to the front of the house and observed officers interacting with Stephen. *Id.* 39:16-18; 40:10-15. Kendall's location when Barsteceanu fired shots is unknown. *Kendall Depo.* 71:24-25. Immediately after shots were fired Kendall "backed out," stood between the roadway and the house, and returned with his K-9 partner to his patrol car. *Id.* 72:1-13. After the incident, Barsteceanu left the scene with Officer Kendall and went directly to the Sheriff's office. *Barst. Depo.* 140:18-22.

### Officers' Accounts of Who Was in Command

When Machado arrived, she took over and was in command. *Jackson Depo.* 36:9-11. Some officers understood that when Sergeant McRae arrived, as the most senior, he would be in charge. *Jackson Depo.* 36:12-14; *Machado Depo.* at 35:14-15.

According to Barsteceanu, when he first arrived he observed that there were several officers already at the scene, as well as McRae, who he considered the incident commander. *Barst. Depo.* 43:17-22; 89:18-22. Other officers believed Barsteceanu was in command. For example, Barsteceanu's partner, Kendall, believed Barsteceanu was in command of the incident when they breached the entrance. *Kendall Depo.* 37:9-15; 65:7-10.

### Officers' Accounts of Their Prior Knowledge of the Crawleys

Barsteceanu had prior knowledge of the Crawley family because he had responded to their residence approximately four times in the past, three of which were within a four-month period in 20014. *Barst. Depo.* 73:16-19; 77:25; 78:1-2; Doc. 78-7, No. 12. Of these, one was unrelated to the Crawleys (*id.* 76:16-25), two were verbal disturbances between brothers Johnny and Jimmy Crawley (*id.* 77:1-8), and another was for medical aid (*id.* 79:2-3). *See also* Doc. 78-7, No. 12. On at least one occasion, Barsteceanu interacted with Mrs. Crawley and went inside the Crawley

residence. *Barst. Depo.* 77:20-22; 103:1-2. During one 2004 visit, he observed Mrs. Crawley using a walker and she showed him oxygen tanks. *Id.* 79:15-25; 80:1-2. Barsteceanu concluded that she was receiving a lot of medical care. *Id.* 80:3-5. Barsteceanu had prior knowledge of Johnny's, but not Stephen's, criminal history. *Id.* 72:10-11. Barsteceanu had never before met Stephen before the subject incident in 2012, and came to the scene unaware that a third brother, Jimmy, had passed away in 2006. *Id.* 80:17-18. By November 2012, approximately seven years had elapsed since Barsteceanu's last call to the house. *Id.* 73:20-24. Barsteceanu had since heard nothing about the Crawleys. *Id.* 73:25; 74:1-3.

McRae came to the scene with some prior knowledge of the Crawley family due to previously responding to four prior calls, primarily for medical aid, over a 20-year span. *McRae Depo.* 60:6-12; 65:1-7. From these prior visits, McRae had some knowledge of the Crawley house. *McRae Depo.* 93:9-13.

The remaining responding officers had no specific memory of the Crawley family on the date in question and came to the scene with no preconceived notions of the subjects. *Machado Depo.* 47:9-11; *Jackson Depo.* 19:11-17; *Kendall Depo.* 33:9-19.

*Other Undisputed Evidence*

Defendants do not dispute that officers entered the Crawley residence absent a warrant and without consent. *See* Doc. 69-1, pp. 12-16. Defendants make no allegation that they instigated an involuntary mental health hold, known as a "5150," against Stephen Crawley at any relevant time. *See generally* Doc. 40; Def. Opp., Doc. 75. Defendants do not allege that Stephen was destroying or removing evidence or was an imminent threat to escape. *Jackson Depo.* 49:6-15; 50:9-13; *Kendall Depo.* 63:20-25; *Machado Depo.* 57:9-18. At no time did McRae smell gas at the scene. *McRae Depo.* 104:2-3.

On the date of the incident, the responding officers had assigned officer numbers and carried numerous different department-issued force options. Specifically, Alvarez was equipped with several force options: on his person he had a baton, taser, and handgun; in his vehicle he had a shotgun and rifle. *Alvarez Depo.* at 20:13-16. Machado carried on her an ASP baton, a taser, pepper spray, and a .40 caliber Glock sidearm. *Machado Depo.* 48:1-25. Kendall had with him a taser, OC

26

spray, expandable baton, Six Hour .45 pistol, and his K-9 partner, "Kimo." *Kendall Depo.* 25:18-24. Kendall was wearing a full police uniform with a badge, shoulder patches, identification patch and name badge, along with a bulletproof vest. *Id.* 27:8-17. Jackson had several force options, a handgun, patrol rifle, a lethal shotgun, as well as a less-than-lethal shotgun. *Jackson Depo.* 20:20-25; 21:1, 20-21.

McRae had several force options, including a baton, OC spray, taser, side-arm, rifle, a shotgun, as well as a less-lethal bean bag shotgun. *Id.* 66:17-25; 67:8-20. McRae's unit number at all relevant times was "Sam 276." *Id.* 56:10-11. Barsteceanu did not carry a baton or OC spray, but had with him several force options, including a taser, a .40 caliber Glock 22 handgun, and in his car he possibly carried a Colt M4 fully-automatic rifle. *Barst. Depo.* 53:11-17; 56:15-24; 57:4-8, 16-18.

At all relevant times, Machado was Barsteceanu's wife. *Barst. Depo.* 113:2-3. At all relevant times, Jackson was a close neighbor of Barsteceanu and his wife, Machado. *Jackson Depo.* 10:9-16. At the time of the incident, Deputies Monteiro and Scott had only very recently completed their training. *Machado Depo.* 20:20-25.

Plaintiff's generally dispute Defendants' accounts, but do not dispute that the relevant officers had probable cause to arrest Stephen on charges of violating California Penal Code section 245. The parties further agree that the underlying alleged crime was assault with a deadly weapon, known colloquially to officers as "a 245," which can be a misdemeanor or felony under California Penal Code section 245.

At all relevant times, KCSD had a policy number 414 titled "Hostage and Barricade Incidents," the purpose of which is to provide guidelines for situations where deputies have legal cause to arrest a person when the person refuses to submit by remaining in the structure or vehicle, or by taking a hostage. *Machado Depo.* 60:1-10. A barricade situation is defined as a subject refusing to exit a structure after a lawful order, and a hostage situation is the same, except the person is holding another against their will. *Id.* 60:11-21. Policy 414 states that unless circumstances require otherwise, deputies handling a barricade should attempt to avoid a forceful confrontation in favor of stabilizing the incident by establishing and maintaining communication. *Id.* 62:8-13.

## II. PROCEDURAL HISTORY

Plaintiffs filed suit on December 13, 2013, followed by a FAC on March 12, 2014. Docs. 1 & 15. A June 19, 2014 Order adopted the Magistrate Judge's recommendation to partially grant Defendants' motion to dismiss, but allowed Plaintiffs leave to amend. (Docs. 27 & 28).

Plaintiffs filed a SAC (Doc. 30) on July 17, 2014, which Defendants answered on July 31, 2014 (Doc. 32). In their SAC (the operative complaint), Plaintiffs allege seven causes of action. The thrust of all of Plaintiffs' claims is that Defendants' actions constitute excessive force, which violated Plaintiffs' constitutional rights, and which resulted in Plaintiffs suffering damages.

On June 10, 2015, per the parties' stipulation, the Court issued an order dismissing Kings County and the Kings County Sheriff's Department as Defendants, and dismissing with prejudice the second cause of action for municipal liability. (Doc. 67). Six causes of action remain for: (1) violation of the Fourth Amendment based upon unreasonable search and seizure, and excessive force (first cause of action); (2) violation of the Fourteenth Amendment right to due process (third cause of action); (3) state law battery (fourth cause of action); (4) state law negligence/wrongful death (fifth cause of action); (5) state law negligent infliction of emotional distress (sixth cause of action); and (6) state law Civil Code § 52.1 claim (seventh cause of action). The first, fourth, and seventh causes of action are survival claims brought by the Estate. The third cause of action is brought by Mrs. Crawley and Johnny. The fifth cause of action is brought by the decedent's mother, Mrs. Crawley. The sixth cause of action is brought by Johnny.

The instant motion is now ripe for review.

## III. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249. The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See Anderson,* 477 U.S. at 255; *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is

merely colorable or is not significantly probative, summary judgment may be granted. *See Id.* at 249-50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Ca*trett, 477 U.S. 317, 322-23 (1986). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Mat*sushita *Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at 250.

## DISCUSSION

Defendants' summary judgment motion primarily argues the Defendants' conduct was objectively reasonable as a matter of law. While the parties agree on material facts leading to the encounter between Stephen and law enforcement, the parties' accounts diverge on key facts. As detailed below, genuine issues of material fact exist concerning whether Defendants' (a) warrantless entry and, (b) use of force, post-entry, was objectively reasonable. Because some measure of fact-finding is required, summary judgment in favor of Defendants is inappropriate. Additionally, Defendants fail to meet their burden to prove that they are entitled to qualified immunity as a matter of law.

## I. SECTION 1983 CLAIMS

Section 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by a person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635, 639 (1980). To succeed in asserting the Section 1983 claims, Plaintiffs must demonstrate that the action

(1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right. *Leer v. Murphy,* 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted); *see also West v. A*t*kins*, 487 U.S. 42, 48 (1988).  As the moving party, Defendants bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Plaintiffs'] case." *Celotex,* 477 U.S. at 325. It is also Defendants' burden to prove that they are entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir. 2005).

Defendants argue that they are entitled to summary judgment in their favor because: (1) undisputed evidence shows that the officers' warrantless entry was justified under the emergency aid exception to the warrant requirement; (2) Barsteceanu used reasonable force to defend himself; and (3) the Defendants are protected by qualified immunity. The Court first evaluates the reasonableness of the Defendants' warrantless entry, then turns to the reasonableness of Barsteceanu's subsequent use of force.

**A.  Fourth Amendment Claims (First Cause of Action)**

The parties agree that Defendants acted under color of state law, but dispute whether they violated the Decedent's Fourth Amendment rights.

**1.  Unreasonable Search**

Plaintiffs allege that by kicking down the front door of the Crawley Residence without a warrant Defendants violated Stephen's Fourth Amendment rights.

Defendants admit that Barsteceanu kicked down the front door at the Crawley residence without a warrant or consent. However, they argue that the breach does not trigger Fourth Amendment protections because the only actual physical entry into the house might have been "Barsteceanu's momentum carrying him in slightly when the door opened." Doc. 69-1, 14:19-20. In the alternative, Defendants argue that because officers entered the home to render aid in an emergency, the exigency exception to the warrant requirement applies and the officers' entry was constitutional, citing *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015).

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth

Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991) (citations omitted). It is a defendant's burden to justify a warrantless search or seizure. *See e.g. California v. Acevedo*, 500 U.S. 565, 590 n.5 (1991) (quoting *United States v. Jeffers,* 342 U.S. 48, 51 (1951) ("[B]ecause each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and 'the burden is on those seeking the exemption to show the need for it.'").

The Court finds unpersuasive Defendants' argument that the officer's slight, unintentional step into the residence does not constitute entry. Defendants assert that their intent was only to establish a "line of sight," nevertheless, they admit an officer kicked down the door and breached the threshold of the Crawley residence. *See Barst. Depo.* 139:5-6. This entry triggers Fourth Amendment protections. *See U.S. v. Vaneaton*, 49 F.3d 1423, 1426 (9th Cir. 1985) (describing the entrance to a private residence as the "firm line [drawn] at the entrance to the house," which an officer may not cross); *Payton v. New York*, 445 U.S. 573, 590 (1980) ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house."). "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Fisher v. City of San Jose*, 558 F.3d 1069, 1091 (9th Cir. 2009) (quoting *Payton,* 445 U.S. at 590).

Warrantless searches of the home are "presumptively unreasonable." *Payton,* 445 U.S. at 586. This is a rebuttable presumption. *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (quoting *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir.2009)). Absent a warrant, "officers must have either probable cause and exigent circumstances or an emergency sufficient to justify the entry," to make the entry lawful. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014) (citing *Struckman*, 603 F.3d at 738; *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam)). Warrantless entries must be "strictly circumscribed by the exigencies which justify [their] initiation." *Mincey v. Arizona,* 437 U.S. 385, 393 (1978) (quoting *Terry v.*

1  *Ohio*, 392 U.S. 1, 25-6 (1968)). The question becomes whether an exception to the warrant

2  requirement applies.

3      *Exceptions to the Warrant Requirement*

4    Defendants assert that the emergency aid exception applies as a matter of law. Defendants

5  acknowledge that it is well-settled that warrants generally are required to search an individual's

6  home unless exigencies exist which render law enforcement's need "so compelling that the

7  warrantless search is objectively reasonable under the Fourth Amendment." Doc. 69-1 (citing

8  *Mincey*, 437 U.S. at 393-4). However, Defendants argue that it was objectively reasonable for the

9  officers to conclude that conditions posed an immediate threat of injury or danger because Stephen

10 was acting "crazy" and officers did not know whether he had possible access to a kitchen knife and

11 might be a danger to himself or, if Mrs. Crawley was home, others. On that basis, Defendants

12 contend that officers recognized "the need to assist persons who are seriously injured or threatened

13 with such injury." Doc. 69-1 (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).

14 Defendants posit that "iron-clad proof of a likely serious, life-threatening injury" is not necessary to

15 trigger the emergency aid exception, rather, officers "merely need a reasonable basis for believing

16 that someone is in danger or in need of medical assistance." *Id.* (citing *Michigan v. Fisher*, 558 U.S.

17 45, 49 (2009). Defendants assert that less intrusive alternative tactical plans may have been

18 available, but that law enforcement need only act reasonably, and do not necessarily need to elect

19 the least intrusive means. *See Billington v. Smith*, 292 F.3d 1177, 1188-1189 (9th Cir. 2002).

20   Defendants argue that a plaintiff cannot "establish a Fourth Amendment violation based

21 merely on bad tactics that result in a deadly confrontation that could have been avoided." *Id.* at

22 1190.  Plaintiffs counter that Defendants do not demonstrate the requisite specific and

23 particularized facts to support an emergency aid exception. *See Sandoval*, 756 F.3d at 1164 (finding

24 that an officer's concerns must be based on "particularized or imminent threats of violence, as the

25 emergency aid exception demands.") (citing *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir.

26 2002) (per curiam)).

27   Exceptions to the warrant requirement are "narrow and their boundaries are rigorously

28 guarded." *Hopkins v. Bonvicino,* 573 F.3d 752, 763 (9th Cir. 2009) (internal quotation marks

omitted). It is well-settled that the exception applies only where "there is [a] compelling need for official action *and* no time to secure a warrant." *United States v. Fowlkes*, 770 F.3d 748, 756 (9th Cir. 2014) (emphasis added) (citing *McNeely*, 133 S.Ct. at 1559 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978))). Specifically, "[t]here are two general exceptions to the warrant requirement for home searches: exigency and emergency." *Struckman*, 603 F.3d at 738 (citing United *States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir.2005).

Here, Defendants assert the emergency exception, which "stems from the police officers' "community caretaking function" and allows them "to respond to emergency situations" that threaten life or limb; this exception does "*not* [derive from] police officers' function as criminal investigators." *Id.* (quoting *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir.2000) (emphasis added)). In practice, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Sheehan*, 135 S. Ct. at 1774-5 (quoting *Brigham City*, 547 U.S. at 403; *Kentucky v. King*, 131 S.Ct. 1849, 1856-57 (2011)); *see also United States v. Echegoyen*, 799 F.2d 1271, 1278 (9th Cir. 1986) ("Included within this definition of exigent circumstances is '[t]he need to protect or preserve life or avoid serious injury'") (quoting *Mincey*, 437 U.S. at 392).

The fact-determinative test for an emergency exception is the contemporaneous presence of actual and immediate serious consequences. *See, e.g., Ryburn v. Huff*, 132 S.Ct. 987, 990 (2012) (finding that "the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence"); *see also Sims v. Stanton*, 706 F.3d 954, 961 (9th Cir.) *cert. granted, decision rev'd on other grounds*, 134 S.Ct. 3, (2013) ("The burden to show exigent circumstances rests on the officer, who must "point [ ] to some real immediate and serious consequences if he postponed action to get a warrant.") (internal quotation marks and citation omitted) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). The police carry the burden to demonstrate "specific and articulable facts to justify the finding" of an emergency. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000). Rather than with 20/20 hindsight, "[t]he exigencies must be viewed from the totality of circumstances known to the

officers at the time of the warrantless intrusion." *United States v. Licata,* 761 F.2d 537, 543 (9th Cir. 1985).

Defendants rely on *Brigham City* to support their argument that entry was objectively reasonable. In that case, the Supreme Court found the officers' entry "plainly reasonable" where officers responded at 3 o'clock in the morning to a residential party where officers heard sounds coming from inside of a loud, violent fight involving multiple people. 547 U.S. at 403. Looking through a window, investigating officers saw a juvenile break free from being held back by several adults, and contemporaneously watched the juvenile strike one of the adults in the face "sending the adult to the sink spitting blood," immediately prior to the officers' entry. *Id.* The Court concluded that an objectively reasonable basis existed for believing that the injured adult needed help and that the officers' entry would prevent additional violence in the house. *Id.* at 406.

Such conditions do not exist here. Unlike *Brigham City*, the Defendants do not contend that they witnessed a contemporaneous altercation. To the contrary, they concede that by the time they arrived the alleged assault was completed and the victim, Johnny, was safely outside the home in the company of officers. Defendants also do not allege that they saw blood inside the Crawley residence or any evidence that someone inside the residence was injured.

Defendants also rely on *U.S. v. Snipe*, in which the Ninth Circuit considered that officers responded in the middle of the night (5 a.m.) to a hysterical emergency caller who instructed dispatch to "[g]et the police over here now." 515 F.3d 947, 953 (9th Cir. 2008). In addition to the call for help apparently coming from inside the home, when officers arrived they found additional information to support that an emergency was ongoing inside the residence. *Id.* Specifically, a neighbor and percipient witness noticed an unfamiliar car presently at the residence, reporting also that he saw an individual he did not recognize recently enter the residence, and an officer testified that the residence's front door was ajar and a light was on inside at that late hour. *Id.* Based on the totality of the circumstances, the circuit court concluded that an objectively reasonable basis existed for believing there was an immediate need to protect "others" from serious harm when officers entered Snipe's residence. *Id.*

//

34

Unlike *Snipe*, here, viewing the evidence in a light most favorable to Plaintiffs, the record evidence does not support a finding that anyone other than Stephen was inside the house or that anyone in the house was in imminent danger. To the contrary, Defendants knew prior to breaching the door that the alleged victim, Johnny, was safely outside and away from the house. Nor did they specifically learn that anyone else was inside. Speculation aside, if disputes about the record evidence are resolved in Plaintiffs' favor, prior to the breach the only evidence garnered at the scene from percipient witnesses (Johnny and first-responding officers) was that Mrs. Crawley was *not* home, in other words, not in any imminent danger. There is no record evidence indicating that Defendants made efforts to verify Barsteceanu's stale memories about Mrs. Crawley and there is a material question of fact whether their reliance on his deductions was reasonable. *Cf. Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 536 (9th Cir. 2010) (citing *Torres v. City of Los Angeles,* 548 F.3d 1197, 1212 (9th Cir. 2008) (holding that there was a material issue of fact regarding whether a reasonable officer would have relied on information possessed by the detectives without further verification where detectives had a general description of the suspect, no evidence of plaintiff's gang affiliation, and no physical evidence tying plaintiff to the crime). Also, no direct evidence existed at the scene to support the officers' hypothesis that Stephen was a danger to himself from knives in the kitchen. Speculation does not make it so. Finally, the time of day is a weight on the scale because, in both *Brigham City* and *Snipe*, officers responded to calls in the middle of the night. The courts noted that the time of day changes how a reasonable officer might interpret facts at the scene. *See Brigham City*, 547 U.S. at 406; *Snipe*, 515 F.3d at 953. Additionally, as a practical matter, officers may expect a delay in getting a warrant in the middle of the night linked to rousing from sleep the necessary people. Here, the officers responded around noon, thus no such nighttime variables existed.

The Supreme Court's recent decision in *Sheehan* is likewise distinguished on its facts. 743 F.3d 1211 (9th Cir.) *cert. granted sub nom. City & Cnty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 702 (2014) and *rev'd in part, cert. dismissed in part sub nom. City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015). In *Sheehan*, the defendant officers twice made entry into a room at a mental health care group residence where Sheehan, a woman known to be mentally ill,

resided. *Id.* Prior to calling for police assistance to transport the woman to a facility for an involuntary mental health commitment under California Welfare & Institutions Code § 5150, the social worker concluded that Sheehan was "gravely disabled" based on specific threats against the social worker during an attempted welfare check, coupled with his discovery that Sheehan was not taking her medication. *Id.* The Court reasoned that the officers' initial entry on the basis of the social worker's information was "for the purpose of assessing whether Sheehan needed emergency treatment under § 5150," that officers entered without their weapons drawn, and "had no reason to believe that their entry would trigger a violent confrontation." *Id.* at 1223; *Sheehan*, 135 S. Ct. at 1774. Upon the warrantless entry Sheehan reacted violently, grabbed a knife, threatened to kill the officers, and forced the officers to retreat to the hallway for their safety. *Id.* at 1215. The officers called for backup, but before any arrived they re-entered Sheehan's room with weapons drawn. *Id.* at 1216. About this *second* entry, the Ninth Circuit held that triable issues of fact existed whether officers violated the Fourth Amendment. *Id.* (original emphasis).

The Supreme Court reversed. Finding the circuit court's reasoning too-finely parsed, the Court held that "because the two entries were part of a single, continuous search or seizure, the officers [were] not required to justify the continuing emergency with respect to the second entry." *Sheehan*, 135 S. Ct. at 1775 (citing *Sheehan*, 743 F.3d at 1224 (following *Tyler*, 436 U.S. at 511)). Because the Supreme Court affirmed the Ninth Circuit's conclusion that the first entry was justified (reasoning that officers knew Sheehan had a knife which she had threatened to use to kill three people, and that a delay could make the situation more dangerous), therefore, the second entry "was justified under both continuous search and exigent circumstance rationales." *Id.* at 1777.

The instant case stands apart from *Sheehan*. Defendants concede that officers at the scene did not seek a § 5150 hold against Stephen. Stephen did not make specific threats to kill officers with a knife he was actually holding. Rather, officers thought they heard Stephen say something to the effect of "break bones," and speculated that Stephen *may* have had access to a kitchen knife (which does nothing to distinguish him from almost anyone near a kitchen in an average home), but never saw him with one. Whether officers could distinguish what Stephen said is a credibility issue, and even if they did, whether Stephen's yelling gibberish, banging and screaming alone inside his

36

residence qualifies as a threat to officers outside. Defendants' speculative concerns that Stephen's mother might have been home or that there could have been knives in a kitchen drawer do not rise to the level of specific and articulable facts to justify a finding of exigent circumstances as a matter of law. *See LaLonde,* 204 F.3d at 957*; see, e.g., Rouzan v. Thomas,* No. CV 12-10352-BRO JPR, 2014 WL 2586797, at \*12 (C.D. Cal. Apr. 21, 2014), *report and recommend*ati*on adopted*, No. CV 12-10352-BRO JPR, 2014 WL 2586837 (C.D. Cal. June 6, 2014) (finding that even if the deputies "were unable to determine from the suspect whether there were any other people in the house, that alone would not constitute exigent circumstances as a matter of law, as it is not true that warrantless entry into a home is always justified where the police cannot confirm that there are no injured victims inside a house.") (citing *United St*at*es v. Espinoza*, 403 F. App'x 239, 241 (9th Cir. 2010)); *cf. Dagdagan v. Wentz*, 428 F.App'x 683, 684 (9th Cir. 2011) (no emergency justifying warrantless entry into suspect's home when officers were investigating an assault that occurred two hours earlier, had interviewed the only known victim and knew her to be at home, and had "no reason to believe . . . that anyone other than [the suspect] was present in [the] apartment").

Rather, *Sandoval v. Las Vegas Metropolitan Police Department* is apt. 756 F.3d 1154 (9th Cir. 2014). The officers in *Sandoval*, like the instant Defendants, considered threats . . .

> in terms so general that they could apply to any interaction involving suspects in a home: [the officer] stated '[b]ecause he's inside—the subjects are inside, he is outside. There's multiple rooms that suspects could run to. Possibly ambush us. Kill us. Unknown what weapons there are in the house or what they have hidden inside that residence at the time could possibly hurt us. So we had to control the situation. And he could not control it from outside the residence.'

*Id.* at 1164. The circuit court reasoned that "[c]onstruing such testimony as justifying entry would eviscerate the warrant requirement and support warrantless entry in every home [in a similar situation] . . . . Simply invoking the unknown in these circumstances is not sufficient." The Ninth Circuit found that defendants' assertions lacked particularized facts beyond speculation. *Id.* at 1164 (citing *Ojeda,* 276 F.3d at 488 (noting that, where officers seek to justify a warrantless entry on the basis of "a risk of danger to the arresting officers or third persons," the "government bears the burden of showing specific and articulable facts to justify" invoking the exception) (internal quotation marks omitted))). The court concluded that the conflict raised triable issues of fact as to

whether "violence was imminent," and whether the officers' warrantless entry was justified under the emergency exception. *Sandoval*, 756 F.3d at 1164 (citing *Ryburn*, 132 S.Ct. at 992).

Similarly here, Defendants justify their warrantless entry on the basis of their general concerns for Stephen and Mrs. Crawley, but do not assert that any officer knew about an injury, or saw blood on Stephen or anywhere in the house prior to the breach. Neither do they contend that an altercation was ongoing when they arrived, nor that weapons were involved other than officers' observation that Stephen was "pirouetting" with a golf club. *McRae Depo.* 88:8-17. This Court likewise finds that the parties' conflicting assertions create a genuine dispute of material fact as to whether emergency circumstances existed at the time Defendants entered the house without a warrant. A reasonable jury could find that officers entered the home for the purpose of arresting Stephen. Because the factual issues cannot be resolved as a matter of law, the Court concludes that it remains within the province of a jury to decide.

### 2.  Unreasonable Seizure

#### (a) <u>Excessive Force</u>

Defendants move for summary judgement on Plaintiffs' excessive force claim on the grounds that the force Barsteceanu used was reasonable. Plaintiffs rejoin that Barsteceanu used excessive force when he fatally shot Stephen, and therefore engaged in an unreasonable seizure in violation of the Fourth Amendment. They assert the same claim against McRae on the basis of his supervisory role.

The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Jimeno,* 500 U.S. at 250 (citations omitted); *see also United States v. Chan-Jimenez,* 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen."). But "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002). The question in all cases is whether the use of force was "objectively

reasonable in light of the facts and circumstances confronting" the arresting officers. *Graham,* 490 U.S. at 397 (internal quotation marks omitted).

"Fourth Amendment claims of excessive or deadly force are analyzed under an objective reasonableness standard." *Espinosa*, 598 F.3d at 537 (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)); *see also Graham,* 490 U.S. at 396. Deadly force may be used when "it is necessary to prevent [the suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner,* 471 U.S. at 3. The reasonableness of a particular use of force must be considered in the context of the relevant objective facts and circumstances that confronted the officer in each particular case "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013) (quoting *Graham*, 490 U.S. at 396-97 (citing *Terry,* 392 U.S. at 20-22 (1968))). The analysis must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Analyzing whether a Fourth Amendment violation has occurred requires a "careful balancing" of the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances. *Id.* at 396-97; *Price v. Sery,* 513 F.3d 962, 968 (9th Cir. 2008).

This is a three-step inquiry. *Glenn v. Washington Cnty.,* 673 F.3d 864, 871 (9th Cir. 2011). First, the district court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Espinosa,* 598 F.3d at 537 (quoting *Miller v. Clark Cnty.,* 340 F.3d 959, 964 (9th Cir. 2003)). "[E]ven where some force is justified, the amount actually used may be excessive." *Santos,* 287 F.3d at 853. Second, a court must evaluate the government's interest in the use of force. *Glenn*, 673 F.3d at 871 (citing *Graham,* 490 U.S. at 396). Finally, "we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller,* 340 F.3d at 964.

*//*

**Excessive Force: Defendant Barsteceanu**

(1) Nature and Quality of Intrusion

The first of the three steps is to evaluate the severity of the intrusion on the individual's Fourth Amendment rights by assessing "the type and amount of force inflicted." *Id.*; *see also Davis v. City of Las Vegas,* 478 F.3d 1048, 1055 (9th Cir. 2007) (finding that such inquiries begin with an assessment of "the quantum of force used"). Such details provide the foundation of the analysis and must be set forth "because the factors articulated in *Graham,* and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to affect a particular seizure." *Davis,* 478 F.3d at 1055 (citing *Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (internal quotations omitted)).

It is undisputed that when Barsteceanu fired two to three shots at Stephen with his firearm he used "deadly force," the level of serious intrusiveness of which is "unmatched." *Garner,* 471 U.S. at 9; *Smith*, 394 F.3d at 705 (holding that for purposes of an excessive force analysis "'deadly force' is force that creates a substantial risk of death or serious bodily injury").

(2) Government interest

The second step requires the court to evaluate the government's interests by assessing: (i) whether the suspect posed an immediate threat to the officers' or public's safety; (ii) the severity of the crime, and (iii) whether the suspect was resisting arrest or attempting to escape. *Glenn,* 673 F.3d at 872 (citing *Graham,* 490 U.S. at 396). A court may also consider other factors relevant to the particular circumstances, such as the availability of less intrusive alternatives. *Id.* (citing *Bryan v. MacPherson,* 630 F.3d 805, 826 (9th Cir. 2010)). For example, in assessing the reasonableness of an officer's actions "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." *Chew v. Gates,* 27 F.3d 1432, 1441 n. 5 (9th Cir. 1994).

*i.   Immediate Threat*

Of the *Graham* factors, the "most important" is whether the suspect posed an "immediate threat to the safety of the officers or others." *Bryan*, 630 F.3d at 826-28 (citing *Smith*, 394 F.3d at 702).

//

*Whether Stephen Posed an Immediate Threat, Pre-Breach*

Prior to the breach, the undisputed evidence suggests that Stephen's bizarre, volatile, and unresponsive conduct could lead an officer to be in a state of high alert. Before Defendants kicked down the door, Stephen did not respond as officers banged on his windows and doors. Officers heard him screaming and, at one point through a window, watched him inside the house swinging a golf club in the air. However, this unusual circumstance "does not, by itself, justify the use of significant force." *Id.* at 826 (finding that although the suspect's volatile, erratic conduct created an unusual situation, one which could lead an officer to be wary, it did not, without more, justify using significant force). To do so, "the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public." *Id.* Defendants' speculative concerns about Mrs. Crawley's presence or Stephen's possible access to a kitchen knife are insufficient. "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). Defendants concede that before Barsteceanu kicked open the door Stephen posed no imminent threat to officers. While Stephen's conduct was bizarre, it is undisputed that for the approximately 25 minutes officers were at the scene the situation was static: Stephen was inside the house alone, intermittently screaming and banging, and officers tried unsuccessfully to make contact with him. Notwithstanding their fruitless efforts, the Ninth Circuit has made clear that the "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Glenn*, 673 F.3d at 876-77 (9th Cir. 2011) (quoting *Deorle,* 272 F.3d at 1281); *see also Mattos v. Agarano*, 661 F.3d 433, 451 (9th Cir. 2011). The pre-breach circumstances weigh against using significant force.

*Whether Stephen Posed an Immediate Threat, Post-Breach*

Defendants argue that, post-breach, Barsteceanu's defensive use of deadly force was reasonable because in the moments immediately preceding shots fired he faced an imminent threat of serious injury or death. However, Plaintiffs emphasize that two primary material facts are in dispute. First, they posit that Stephen, at the moment he was shot, was too far from any officers at the front door to be considered an actual threat based on the location of the recliner in the living

room next to which Stephen was either walking or standing when shot. Absent from the record is the length of the golf club, clear evidence on where investigators initially found the golf club relative to Stephen's body, or the exact distance from the chair to the front door. But record evidence supports that Stephen collapsed when and where he was shot (*Jackson Depo.* 89:2-3), and when officers went to render aid they found him next to a recliner chair in the living room. *See Alvarez Depo.* 56:10-12. Although there is no evidence to indicate how far the recliner chair in the living room stood from the front door, the testimony and evidence about the interior of the Crawley residence suggests that the chair was more than a few feet from the threshold. *See, e.g.,* Doc. 87-2, at p. 207. This seems to contradict Barsteceanu's testimony that he fired when Stephen was two or three feet away from the door.

Next, Plaintiffs argue that the officers' different accounts put their credibility in question. Plaintiffs emphasize that contrary to the officers' concerns about a knife, the undisputed evidence is that when Stephen collapsed officers found that he was holding a piece of Styrofoam (DUMF No. 78), later identified as part of a Cup O'Noodles container. *See* Doc. 87-2, at p. 208. Defendants concede that Stephen was not holding a weapon other than the golf club when Barsteceanu fired shots, but they otherwise challenge Plaintiffs' facts.

Distilled, the parties' accounts diverge on key facts about the moments immediately prior to Barsteceanu firing his weapon. While a reasonable jury could find, as Defendants assert, that in the moment when Barsteceanu fired his weapon he faced a volatile man running at him and threatening to attack officers with an implement which could cause significant injury or death, the Court must resolve genuine issues of fact in Plaintiffs' favor. Taken together, the record evidence puts in genuine dispute whether Stephen was close enough to hit anyone with the golf club, or posed an actual threat when shot. On these facts, a reasonable jury could find that in the moments preceding the use of force Defendants did *not* face an imminent threat of serious injury or death. Absent such a threat, a jury could thus conclude that Stephen's conduct did not justify using deadly force.

*Provocation Doctrine*

Even if Stephen posed an immediate threat, the finding is not dispositive. A defendant may still be liable for excessive force under the provocation doctrine. Where an officer "intentionally or

42

recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington*, 292 F.3d at 1189. That means if a jury finds an officer's use of force *lawful*, but the warrantless entry *unlawful*, then, "even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force." *Id*.

Applying the doctrine in *Espinosa*, the Ninth Circuit found that an officer's warrantless entry served as the predicate violative conduct and, finding a causal link, reasoned that "the illegal entry created a situation which led to the shooting and required the officers to use force that might have otherwise been reasonable." 598 F.3d at 539 (citing *Alexander v. City & Cnty. of San Francisco*, 29 F.3d 355, 1366 (9th Cir. 1994)). Similarly, in *Alexander*, the court found that the officers' warrantless entry into a man's home was violative of the Fourth Amendment, and found that the warrantless entry provoked the man to shoot at officers. 29 F.3d at 1366.

Applying the doctrine to the instant case, a jury could find that Stephen ran at officers at a full sprint, threatening them with a raised golf club, and on that basis conclude that Barsteceanu was justified in using deadly force against an immediate threat of serious harm, but nevertheless could find that Defendants provoked the violent confrontation by kicking down the door in an unlawful warrantless entry.

Defendants challenge whether Plaintiffs offer sufficient evidence to support a finding that Defendants provoked the violent confrontation. Viewed in Plaintiffs' favor, record evidence shows that multiple officers banged on the house's windows and doors but had indications that Stephen calmed when they stopped trying to contact him. The record evidence is that noises emanating from the house escalated when officers pounded on the house and windows attempting to prompt Stephen's response, but intermittently diminished or went silent when officers paused their efforts. There is no dispute that Johnny told multiple officers that he thought opening the door would escalate the situation, suggesting that Stephen would "come at them" if they opened the door. Defendants contend that they saw Stephen swinging his golf club inside the house. This is the same conduct which serves as their primary justification for the use of deadly force, the only added

variable being that officers had removed the door separating them from Stephen. Based on this record evidence, a trier of fact could reasonably conclude that Defendants' warrantless entry into the house recklessly or intentionally provoked Stephen. *See Espinosa*, 598 F.3d at 539 (citing *Alexander*, 29 F.3d at 1366). Here, because it is possible that a reasonable jury could find that "an officer intentionally or recklessly [provoked] a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise *reasonable* defensive use of force *unreasonable* as a matter of law." *Billington*, 292 F.3d at 1190-1.

The Court concludes that Plaintiffs present a genuine dispute of material fact whether by their warrantless entry Defendants intentionally or recklessly provoked the violent confrontation with Stephen. Thus, summary judgment is inappropriate. *Espinosa*, 598 F.3d at 539.

### ii.   Severity of Crime

The parties agree that Defendants had probable cause to arrest Stephen for an alleged assault with a deadly weapon against Johnny. Assault with a deadly weapon or by force likely to produce great bodily injury is categorically a "crime of violence," which can be either a misdemeanor or a felony. *See United States v. Valdovinos-Mendez*, 641 F.3d 1031, 1035 (9th Cir. 2011) (citing *United States v. Grajeda,* 581 F.3d 1186, 1189-92 (9th Cir. 2009)). The parties dispute whether the underlying crime should be considered a misdemeanor or a felony. However, it is objectively reasonable that officers considered Stephen a dangerous felony suspect at the time because the allegations involved a violent crime. This factor supports using some measure of force.

### iii.   Resisting Arrest or Attempting Escape

Defendants do not assert that Stephen was resisting arrest or attempting to escape. This factor weighs in Plaintiffs' favor.

### iv.   Other Considerations

"[T]he giving of a warning or failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle,* 272 F.3d at 1284. "[W]arnings should be given, when feasible, if the use of force may result in serious injury." *Id.*  Police are also "required to consider '[w]hat other tactics if any were available' to effect the arrest." *Headwaters Forest Def. v. Cnty. of Humboldt*,

240 F.3d 1185, 1204 (9th Cir. 2000) *cert. granted*, *judgment vac*at*ed on other grounds*, 534 U.S. 801 (2001) (quoting *Chew,* 27 F.3d at 1443).

Plaintiffs do not dispute that Barsteceanu gave a warning before he used deadly force and that the incident happened in a matter of seconds. Despite the officers' testimony that they had mere moments to decide to take action before the situation escalated, Defendants concede that the officers met at least once, probably more, about how to proceed before escalating to breaching entry and the use of force. Defendants show that they had time to evaluate their options as they circled the house, but submit no evidence to support that they did not have time to get a warrant. The Court finds that this factor weighs in favor of Plaintiffs.

Defendants admit that they did not consider any options other than kicking down the door with Barsteceanu in the foreground leading with deadly force. Defendants argue that in that moment Barsteceanu had no time to re-evaluate and that he was forced to react. In other words, the Defendants rehash the argument that Barsteceanu was justified in using deadly force, but do not meaningfully address whether Defendants considered other less significant means of force. This rationale is insufficient to justify not considering less significant force. *See Deorle*, 272 F.3d at 1281. Defendants also admit that the officers considered no option other than leading with deadly force, despite there being "clear, reasonable, and less intrusive alternatives." *Bryan*, 630 F.3d at 831. Indeed, Defendants admit that they had multiple less-lethal means of force at the scene. Specifically, Jackson had a "bean-bag" shotgun, Kendall had a K-9 partner, and numerous officers carried tasers and pepper spray. Defendants' testimony is that these officers were positioned at the house's doors and that they had a semi-perimeter around the house. The number of officers available changes "the tactical calculus" because multiple officers had myriad ways to resolve the situation without the need for deadly force. *Id.* This finding does not contradict the principle that police officers need not employ the "least intrusive" degree of force possible. *See Gregory v. County of Maui,* 523 F.3d 1103, 1107 (9th Cir. 2008) (citing *Forrester v. City of San Diego*, 25 F.3d 804, 807-8 (9th Cir. 1994)). This is to say that the Court "merely recognize[s] the equally settled principle that officers must *consider* less intrusive methods of effecting the arrest and that the presence of feasible alternatives is a *factor* to include in [the] analysis. *Bryan*, 630 F.3d at 831.

The Court concludes that because Defendants admit they did not consider less intrusive means of de-escalating the situation, this factor weighs against them in the *Graham* analysis.

(3)  Balancing Competing Interests

Lastly, the Court balances "the gravity of the intrusion on the individual against the government's need for the intrusion." *Glenn*, 673 F.3d at 871 (quoting *Miller,* 340 F.3d at 964). Because the reasonableness balancing test "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," courts should grant summary judgment in excessive force cases "sparingly." *Id.*, at 871 (quoting *Smith,* 394 F.3d at 701). "This is because police misconduct cases almost always turn on a jury's credibility determinations." *Drummond,* 343 F.3d at 1056. However, a court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was objectively reasonable under the circumstances." *Jackson v. City of Bremerton,* 268 F.3d 646, 651 n. 1 (9th Cir. 2001) (internal quotation omitted); *Sheehan*, 135 S. Ct. at 1765. Here, the Court is not compelled to find the balance of competing interests in favor of a specific party because the genuine disputes about what the officers confronted when they opened the Crawleys' front door remain unresolved and ultimately are the province of a jury to decide.

In sum, because a jury could reasonably find that Stephen did not pose an immediate threat of serious injury or death to officers in the moments before he was shot, the Court must leave the credibility determinations on this disputed material fact to the jury. *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). Summary judgment on this claim against Barsteceanu is inappropriate.

**<u>Excessive Force: Defendant Sergeant McRae</u>**

Defendants fail to separate their arguments about Barsteceanu and McRae, instead treating the officers' actions as if the law treats them the same. It does not. The uncontroverted evidence is that McRae used no force against Stephen. Plaintiffs nowhere explain their theory of liability for McRae, but the only two possible bases for liability would be under theories of (1) integral participation and/or (2) supervisorial liability.

//

//

46

(1) Integral Participant

To extend liability to one defendant for another defendant's use of excessive force, "even if they did not directly engage in the unconstitutional conduct themselves," a plaintiff must show that the officer was an integral participant in the underlying constitutional violation. *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009). To do so requires "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n. 12 (9th Cir. 2007) (citing *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004) (finding liable for excessive force every officer who provided armed backup for the officer who gained entry to a suspect's home by unconstitutionally deploying a flash-bang device reasoning that "every officer participated in some meaningful way" in the incident, and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing [it] was to be deployed.")). Officers who are mere bystanders or who are a mere member of a team that collectively caused a constitutional violation are not, without more, considered integrally involved. *See Chuman v. Wright*, 76 F.3d 292, 294-5 (9th Cir. 1996).

Here, it is undisputed that McRae participated in the decision-making process related to the warrantless entry, and Plaintiffs argue that it was the warrantless entry that provoked the use of deadly force. Because the Court determined, *supra*, that a genuine issue of material fact persists for trial about whether the warrantless entry violated Stephen's Fourth Amendment rights, McRae's participation in the decision-making and the breach could result in a jury finding that he was an integral participant in a constitutional deprivation.

(2) Supervisory Liability

Alternatively, McRae could be liable under a theory of supervisory liability. For purposes of 42 U.S.C. § 1983, "supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013); *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989). However, "[a] supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Crowley*, 734 F.3d at

47

977; *Hansen,* 885 F.2d at 646. A plaintiff can demonstrate a sufficient causal connection between a

supervisor's conduct and a constitutional violation by offering evidence that:

> (1) the supervisor sets in motion a series of acts by others, or knowingly refuses to terminate a series of acts by others, that the supervisor knew or reasonably should know will cause others to inflict a constitutional injury; (2) the supervisor's own culpable action or inaction in the training, supervision, or control of his subordinates; (3) the supervisor's acquiescence in or ratification/condoning of the constitutional deprivation; or, (4) conduct by the supervisor that showed a reckless or callous indifference to the rights of others.

*Booke v. Cnty. of Fresno*, No. 1:13-CV-586 AWI SAB, 2015 WL 1529448, at *20 (E.D. Cal. Apr.

2, 2015) (collecting cases).

McRae could be liable under a supervisory theory because he could be found to have set in

motion, or at the very least acquiesced to, the actions that led to the constitutional deprivation.

Defendants admit that: McRae was present at the scene at the time of entry and use of force;

Barsteceanu considered McRae the incident commander; and, pre-breach, McRae met with

Barsteceanu and condoned his plan for entry. In sum, because the Court determined, *supra*, that a

genuine issue of material fact persists for trial about whether the warrantless entry violated

Stephen's Fourth Amendment rights, the ripple effect is that McRae's supervisory role could result

in a jury finding that he condoned a constitutional deprivation.

### (3) Causal Link

The question then becomes whether the alleged violative act (the warrantless entry in which

McRae was a central actor) actually led to Barsteceanu's using (the perhaps otherwise reasonable)

deadly force. Plaintiffs assert that "Defendant Barsteceanu and McRae's failure to appropriately

assess the lack of 'exigent' and/or 'emergency' circumstances justifying their warrantless entry

undeniably lead to Stephen's demise." Doc. 73, at 19:25-7. Defendants dispute this logical step.

Recursively, the warrantless entry again impacts this analysis. Plaintiffs contend that by kicking

down the door and entering the home Defendants provoked a confrontation with Stephen because,

prior to entry, the officers thought they would find Stephen agitated and holding a golf club, and it

is exactly this behavior which serves as the Defendants' justification for drawing and firing their

weapons. This hinges on context. Accepting Plaintiffs' facts, as it must, the Court finds that the

parties have a genuine dispute about whether the officers' alleged reckless entry and threat of force provoked a violent confrontation with Stephen. Plaintiffs present a triable issue whether a causal link exists between McRae's condoning the warrantless entry and Barsteceanu's use of deadly force. *See Espinosa,* 598 F.3d at 538-9. Accordingly, under this theory, McRae may be found liable for excessive force. Factual issues preclude summary adjudication.

### (b) Unreasonable Seizure: Person

The Court acknowledges that Plaintiffs bring an unreasonable seizure claim based on Stephen's allegedly unlawful arrest by Defendants. The parties dispute, *inter alia*, whether officers entered the home for the purpose of effecting Stephen's arrest, but Defendants by their instant motion do not move for summary judgment on Plaintiffs' claim of unlawful seizure of the decedent's person. As such, the Court does not reach the merits of this particular claim.

### B.  Fourteenth Amendment Violations (Third Cause of Action)

Plaintiffs Mrs. Crawley and Johnny each bring a substantive due process claim against Defendants, who move for summary judgment on the claims.

Johnny's substantive due process claim fails as a matter of law because he has no actionable constitutionally protected interest. *See Ward v. City of San Jose,* 967 F.2d 280, 284 (9th Cir. 1992) (sibling has no constitutionally protected interest in brother's companionship under section 1983). Accordingly, the Court grants Defendants' motion for summary judgment on Johnny's claim.

As Mrs. Crawley is Stephen's mother, she has a cognizable substantive due process claim. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008). The Ninth Circuit has recognized that "parents have a liberty interest in the companionship of their adult children and have a cause of action under the Fourteenth Amendment when the police kill an adult child without legal justification." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1106 (9th Cir. 2014) (citing *Porter v. Osborn,* 546 F.3d 1131, 1136 (9th Cir. 2008); *Curnow ex rel. Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir. 1991)).

To succeed in her claim, a plaintiff must demonstrate that an officer's conduct "shocks the conscience." *Tatum v. Moody*, 768 F.3d 806, 820-21 (9th Cir. 2014). A plaintiff can satisfy the standard in either of two ways, (1) by showing that the officer acted with "deliberate indifference,"

or (2) "the more demanding showing that he acted with a purpose to harm." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008); *see also Tatum,* 768 F.3d at 820-21 (distinguishing "conduct that either consciously or through complete indifference disregards the risk of an unjustified deprivation of liberty") (citing *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013)). To determine whether the official conduct using deadly force "shocks the conscience," a court first asks "whether the circumstances are such that actual deliberation [by the officer] is practical." *Porter,* 546 F.3d at 1137 (quoting *Moreland,* 159 F.3d at 372 (internal quotation marks omitted)). If it is, then an officer's "deliberate indifference" may suffice to shock the conscience. Alternatively, if a law enforcement officer made a "snap judgment"[7] because of an escalating situation, a court may find that his conduct shocks the conscience only if plaintiffs demonstrate that he acted with a purpose to harm, unrelated to legitimate law enforcement objectives. *Wilkinson,* 610 F.3d at 554.

1. Whether Deliberation Was Practical

The determination hinges on whether a defendant-officer had time to deliberate before using lethal force, or whether his actions were based on a snap decision. *See, e.g., Hayes*, 736 F.3d at 1230. Plaintiffs generally dispute that the decision was a snap judgment. *See* Doc. 70, at 23:9-11. Instead, Plaintiffs argue that Defendants McRae and Barsteceanu's "chosen course of action to forcibly enter, without a warrant, and seize Stephen Crawley in such a manner as to cost him his life was unreasonable, callous, evil, and despicable." SAC, at 12:25-6. Plaintiffs implicitly argue that the deliberate-indifference standard applies and explicitly argue because officers entered hastily and recklessly, the officers' conduct shocks the conscience. *Id.* By implicitly questioning Defendants' credibility, Plaintiffs dispute Barsteceanu's account that he reasonably reacted to an imminent threat. Plaintiffs emphasize that the deadly force used was unrelated to a legitimate law enforcement objective because, they repeat, the warrantless entry did not comport with the Fourth Amendment.

Reasonableness aside, it is undisputed that after Barsteceanu kicked down the door only seconds elapsed before he fired shots, almost immediately after giving a warning for Stephen to

---

[7] So called because it is made during a situation that escalates "so quickly that the officer must make a snap judgment." *Porter*, 546 F.3d 1131, 1137 (9th Cir. 2008) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998).

"drop it." Notwithstanding their general assertions, Plaintiffs do not meaningfully dispute that Barsteceanu's decision to fire his weapon happened within mere seconds. Whatever the prior deliberations planning the breach, Barsteceanu did not have time, post-breach, to deliberate about his reactions. In the undisputedly fast-evolving post-breach context, the Court finds that actual deliberation was not objectively practical. *Wilkinson,* 610 F.3d at 554 (finding purpose-to-harm standard appropriate where "[w]ithin a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot"); *Porter,* 546 F.3d at 1139 (finding actual deliberation was not practical where a five-minute altercation between the officers and victim evolved quickly and forced the officers to make "repeated split-second decisions") (internal quotation marks omitted). Therefore, the purpose-to-harm standard applies. *See Hayes*, 736 F.3d at 1229-31.

### 2.   Purpose to Harm

Defendants argue that Plaintiffs have no evidence of Barsteceanu's purpose to harm. Plaintiffs attack the legitimacy of Barsteceanu's interests, as the Court discussed at length above as these relate to warrantless entry and arrest, arguing that because the alleged unlawful pursuits are causally linked to the officer's use of deadly force, his actions shock the conscience.

Yet, to succeed on such a claim against Defendants, Plaintiffs must prove that Barsteceanu shot Stephen with the purpose "to cause harm unrelated to the legitimate object of arrest." *Porter,* 546 F.3d at 1140 (internal quotation marks omitted). The record evidence, taken in a light most favorable to Plaintiffs, could support that the Defendants' conduct in the warrantless entry was "reckless, oppressive, or malicious," and that such actions provoked the use of deadly force. Still, this goes to deliberate indifference, not a purpose-to-harm standard.

The Court looks to the recent Ninth Circuit case, *Hayes v. Cnty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013), for guidance. In *Hayes*, under the purpose-to-harm standard, the circuit court considered that officers used lethal force based on their snap decision that Hayes was an immediate threat, although a witness had advised them that there were no guns in the house, the decedent was merely holding a knife, and officers failed to warn the decedent before firing. *Id.* at 1230. The officers entered with their guns holstered, ordered Hayes to show his hands, and when he did

officers saw that he held a large knife, tip down, in one hand. Both officers, interpreting Hayes's actions as an immediate threat, drew their weapons and fired at him. *Id.* The court found that the plaintiff-appellant made "no claim that the deputies acted with a purpose to harm unrelated to the legitimate law-enforcement objective of defending themselves, arguing only that the deliberate-indifference standard should have been applied." *Id.* Finding no evidence that officers used deadly force for any purpose other than self-defense, the court found that the plaintiff-appellant "failed to support her substantive due process claim." *Id.* at 1231 (citing *Wilkinson*, 610 F.3d at 554-55). On this basis, the circuit court affirmed the district court's summary judgment on the Fourteenth Amendment claim.

So, too, here there is no evidence that Barsteceanu had "any ulterior motive" for using deadly force against Stephen. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014) (finding that a reasonable jury could not find that officers' actions "shock[ed] the conscience" where officers did not have time to deliberate and plaintiff-appellants produced no evidence that officers had a purpose to harm). As in *Hayes* and *Gonzalez*, Plaintiff Mrs. Crawley does not present, and the Court cannot find, any evidence that Barsteceanu acted with the purpose to harm Stephen, pre- or post-breach. Therefore, the Court will likewise grant summary judgment on Plaintiffs' Fourteenth Amendment claim.

## II.  QUALIFIED IMMUNITY

Defendants assert that they are entitled to qualified immunity from Plaintiffs' Fourth Amendment claims on two grounds: (1) Defendants' explicitly assert that Defendants' warrantless entry was objectively reasonable and comports with the Fourth Amendment; and, (2) Defendants' implicitly assert that they are entitled to qualified immunity from the excessive force claim, but do not adequately brief the second issue. *See* Doc. 69-1, at 18-19 ("Even if there was a constitutional violation, Sergeant McRae and Deputy Barsteceanu are entitled to qualified immunity."). Despite the Defendants' scant effort, the Court reviews both arguments in advance of the imminent trial.

A qualified immunity analysis is separate and distinct from an excessive force analysis. *Saucier v. K*atz, 533 U.S. 194, 204 (2001). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known.' " *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S.

800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The

protection of qualified immunity applies regardless of whether the government official's error is 'a

mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.*. "The

principles of qualified immunity shield an officer from personal liability when an officer reasonably

believes that his or her conduct complies with the law." *Id.* at 245.

For the purposes of a qualified immunity analysis, the Court must use the injured party's

facts. *Mueller v. Auker*, 576 F.3d 979, 1006 (9th Cir. 2009) ("The first step of *Saucier* asks whether,

viewing the evidence in the light most favorable to the allegedly injured party, the record

establishes a constitutional violation.") (citing *Saucier*, 533 U.S. at 201). In other words, "a court

generally just adopts the version of the facts set forth by the party challenging immunity." *Id.*

(emphasis added) (citing *Scott,* 550 U.S. at 381 n.8 (holding that the dispositive question in the first

step of *Saucier*—whether those facts establish a constitutional violation—"is a pure question of

law")). Because qualified immunity is an affirmative defense, the defendant bears the burden of

establishing entitlement to it. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified

immunity is a defense, the burden of pleading it rests with the defendant.").

Determining whether qualified immunity applies is a two-step sequence. *Saucier v. K*atz,

533 U.S. 194, 232 (2001). The Court must ask (1) "whether the facts that a plaintiff has . . . shown

. . . make out a violation of a constitutional right"; and, (2) "whether the right at issue was 'clearly

established' at the time of defendant's alleged misconduct." *Wilkinson*, 610 F.3d at 550 (quoting

*Pearson*, 555 U.S. at 232).

**A. Constitutional Violation**

"The threshold inquiry in a qualified immunity analysis is whether the plaintiff's

allegations, if true, establish a constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949,

954 (9th Cir. 2003); *see Saucier,* 533 U.S. at 201. If, as alleged, the conduct would not be

53

considered violative, the inquiry stops and the defense of qualified immunity applies. *Id.* However, if the answer to the first inquiry is yes, then the Court must determine whether the constitutional right was so clearly established that a reasonable officer would have understood that his conduct violated that right. *See Robinson v. York,* 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier,* 533 U.S. at 201-02) (finding that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). Even if an officer's conduct does violate the Constitution, "a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity." *Wilkins*, 350 F.3d at 955.

The step-one inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee,* 290 F.3d 965, 969 (9th Cir. 2002). First, the Court has determined that Defendants' warrantless entry, as alleged, constitutes unlawful conduct. The Court also found that the record evidence presents genuine issues of material fact as to whether Barsteceanu's use of deadly force was excessive under the circumstances, and so violated Stephen's Fourth Amendment rights. The Court further determined that because, as alleged, McRae could, under either the integral participant or supervisory theories, be liable in the alleged predicate constitutional violation which led to the use of force, a jury may also find him liable for the warrantless entry and/or the alleged excessive force. Accordingly, Plaintiffs satisfy the first prong of *Saucier* in each instance.

**B.  Clearly Established**

 "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202; *see also Walker v. Gomez,* 370 F.3d 969, 978 (9th Cir. 2004). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640. Here, the subject incident occurred on November 17, 2012.

//

1          1.   Warrantless Entry

2        Summary judgment relative to the warrantless entry on qualified immunity grounds is

3 unwarranted here because, construing the facts in Plaintiffs' favor, *Tolan v. Cotton,* 134 S.Ct. 1861,

4 1863 (2014) (per curiam), no exigency exception applies. As such, it is plain that no reasonable

5 officer could have believed that warrantless entry was lawful in light of Fourth Amendment

6 jurisprudence clearly established long before 2012. *See Parenteau v. Silva*, 593 F. App'x 733, 734

7 (9th Cir. 2015); *see Sanchez v. County of San Diego*, 483 F.3d 965, 968 (9th Cir. 2007)

8 (acknowledging that it is well-established that warrantless entries are presumptively illegal); *see*

9 *also Payton v. New York*, 445 U.S. 573, 585 (1980) (finding that the "chief evil" against which the

10 Fourth Amendment protects is the "physical entry of the home.").

11          2.   Use of Force

12        Turning to the force used by Barsteceanu, it was well-settled by November 2012 that "an

13 officer may not use deadly force to apprehend a suspect where the suspect poses no immediate

14 threat to the officer or others." *Wilkinson,* 610 F.3d at 550; *see Curnow,* 952 F.2d at 325 (affirming

15 denial of qualified immunity where, under plaintiff's version of the 1986 shooting, the officers

16 could not reasonably have believed that deadly force was lawful where decedent did not point the

17 gun at the officers and apparently was not facing them when they shot him the first time). Under

18 Plaintiffs' facts, a reasonable officer would have understood that shooting a person who did not

19 pose an imminent threat does not comport with the Fourth Amendment right to be free from

20 excessive force. Therefore, Plaintiffs satisfy *Saucier*'s second prong as to the excessive force claim.

21        Because a jury could find that Barsteceanu's use of deadly force was violative of the Fourth

22 Amendment, or a reasonable jury could find that Defendants' warrantless entry provoked the use of

23 otherwise reasonable force, the Court concludes that it is premature to determine whether

24 Defendants are entitled to qualified immunity as a matter of law. *See Wilkins,* 350 F.3d at 956

25 ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed

26 issues of fact in their favor, and against the non-moving party, summary judgment is not

27 appropriate"); *accord Santos,* 287 F.3d at 855 n.12 (finding it premature to summarily decide

28 qualified-immunity issue "because whether the officers may be said to have made a 'reasonable

mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom") (internal citation omitted). The Court is not compelled as a matter of law to reach such a conclusion before a trier of fact resolves the material facts in dispute, and Defendants may be entitled to qualified immunity depending on how the factual issues are resolved.

## III.   STATE LAW CLAIMS

In addition to Section 1983 claims, Plaintiffs raise state law claims for battery (fourth cause of action), negligence and wrongful death (fifth cause of action), negligent infliction of emotional distress (sixth cause of action), and violation of California's Bane Act (California Civil Code § 52.1) (seventh cause of action). Defendants move for summary judgment on such claims.

### A.   **Battery (Fourth Cause of Action)**

Defendants move for summary judgment on Plaintiffs' survival action brought by the Estate for state law battery based on the fatal shooting. *See generally* Doc. 69; SAC, ¶¶ 56-61. State law claims for battery are coextensive with claims for excessive force under the Fourth Amendment. *See Sanders v. City of Fresno,* 551 F.Supp.2d 1149, 1179 (E.D. Cal. 2008) *aff'd,* 340 F. App'x 377 (9th Cir. 2009) (citing *Munoz v. City of Union City,* 120 Cal. App. 4th 1077, 1102 n. 6 (2004); *Susag v. City of Lake Forest,* 94 Cal. App. 4th 1401, 1412-13 (2002); *Edson v. City of Anaheim,* 63 Cal.App.4th 1269, 1274 (1998)).

As Plaintiffs' fourth cause of action for battery is the counterpart of the federal claim for excessive force, Defendants' summary judgment motion relative to the state law battery claim fails for the same reason. *Young,* 655 F.3d at 1170 (holding that "the Fourth Amendment violation alleged by [plaintiff] also suffices to establish the breach of a duty of care under California law"); *Brown v. Ransweiler,* 171 Cal. App. 4th 516, 527 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable."). As genuine issues of material fact remain about whether the officer's use of force against Stephen was reasonable, whether that force constitutes battery is also a question for the jury.

//

//

### B.  Negligence, Wrongful Death (Fifth Cause of Action)

Defendants move for summary judgment on Plaintiffs' negligence claim, brought by Mrs. Crawley as Stephen's successor in interest, based on Barsteceanu's use of force.[8] *See generally* Doc. 69; Doc. 30 at ¶ 63. Plaintiffs' claim for wrongful death arises under Cal. Civ. Proc. Code § 377.60, "which is simply the statutorily created right of an heir to recover for damages resulting from a tortious act which results in the decedent's death," *Gilmore v. Superior Court,* 230 Cal.App.3d 416, 420 (1991) (citations omitted). Defendants again argue that Plaintiffs' Section 1983 claims should fail, thus, they argue, Plaintiffs' negligence claims should likewise fail. (Doc. 69, at 20-21). The entirety of Defendants' reasoning is this:

> The Defendants' assessment and decision to enter the Crawley house was reasonable based on the facts known to them at the time. Deputy Barsteceanu's decision to utilize deadly force when attacked by Stephen was also reasonable. Defendants refer to and incorporate herein by reference section IV, A (1) & (2), above.

*See* Doc. 69 at 21:8-11. The Court notes that Defendants do not separate how Barsteceanu, who used force, and McRae, who did not but served in a supervisory role, may be treated differently under the law.[9] Therefore, the Court need not reach this question.

In order to show negligence, a plaintiff must establish "(1) a legal duty to use due care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps,* 647 F.Supp.2d at 1164 (citing *Ladd v. Cnty. of San Mateo,* 12 Cal.4th 913, 917 (1996)). Under California law, "police officers have a duty not to use excessive force." *Id.* (citing *Munoz v. City of Union City,* 120 Cal. App. 4th 1077, 1101 (2004)).

 "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center,* 140 Cal.App. 4th 1256, 1264 (Cal. Ct. App. 2006). The California Supreme Court has held that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Munoz v. Olin,* 24 Cal.3d 629, 634 (1979)

---

[8] In their motion, Defendants wrongly state that Plaintiffs' claim was also brought by Johnny Crawley. *See* Doc. 69-1, at 2:27-28. The SAC plainly states that Norma Crawley – alone – brought the negligence/wrongful death claim, as Stephen's successor in interest. The Court need not address the nonexistent claim.

[9] As it is undisputed that McRae did not himself use any force, presumably Plaintiffs assert that he is liable for the alleged violative conduct based on his supervisory role.

(citing *Grudt v. City of Los Angeles,* 2 Cal.3d 575, 587 (1970)). To succeed in this claim, a plaintiff must show that the officer violated his "duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler,* 171 Cal.App. 4th 516, 526 n.10 (Cal. Ct. App. 2009). Indeed, rather than mirroring the federal standards, California's negligence law "is broader than federal Fourth Amendment law," in that "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability." *Hayes v. Cnty. of San Diego*, 57 Cal.4th 622, 639 (2013); *see also Chien Van Bui v. City & Cnty. of San Francisco*, 61 F. Supp. 3d 877, 903 (N.D. Cal. 2014) ("where the officer's preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the officer's preshooting conduct is properly 'included in the totality of circumstances surrounding [his] use of deadly force.'") (quoting *Hayes,* 57 Cal.4th at 632).

At bottom, Defendants' conclusory argument rehashes the reasonableness of the officers' conduct. While Defendants are correct that this claim swings on the reasonableness determination, it is one which the Court is precluded at this stage from making.

**C.  Negligent Infliction of Emotional Distress (Sixth Cause of Action)**

Under a theory of bystander liability, Johnny alleges a state-law claim for negligent infliction of emotional distress (NIED) against Barsteceanu, as the officer who used lethal force, and McRae, based on his supervisory role. *See* Doc. 73, at 24 (citing *Thing v. La Chusa*, 48 Cal.3d 644, 651 (1989)).

To succeed in a NIED claim under the bystander theory, a plaintiff must show that he: (1) is closely related to the injured victim; (2) was present at the injury-producing event and aware that it was causing injury to the victim; and, (3) suffered serious emotional distress beyond that typically anticipated in a disinterested witness. *Burgess v. Superior Court,* 2 Cal.4th 1064, 1073 (1992) (citing *Thing,* 48 Cal.3d at 647).

Defendants do not challenge on the first two prongs. Undisputedly, Johnny is the decedent's brother, a close relation; was present at the fatal shooting; and was contemporaneously aware his brother had been shot. Rather, Defendants move for summary judgment on the grounds that there is

no evidence that Defendants were negligent or that Johnny suffered severe emotional distress as the result of any awareness that Stephen had been injured. The Court evaluates only the challenge to the third prong because, as discussed above, fact issues remain relative to negligence.

On the third prong, a jury may award damages for Johnny's emotional distress, but only to the extent that it directly results from the injury-producing event at the time it occurs. *See Thing*, 48 Cal.3d at 668. The NIED claim's requisite showing of "'serious' emotional distress is a less exacting standard than the 'severe' standard required of IIED claims." *Akey v. Placer Cnty.*, No. 2:14-CV-2402-KJM-KJN, 2015 WL 5138152, at *8 (E.D. Cal. Sept. 1, 2015) (citing *Graves v. City of Stockton*, No. S040430, 2006 WL 768831, at *7 (E.D. Cal. Mar. 27, 2006)). Although physical injury is not required, the emotional distress must rise to the level that "a reasonable [person], normally constituted," would be unable to endure it. *Molien v. Kaiser Found. Hospitals*, 27 Cal.3d 916, 928 (1980).

Johnny contends that "[a]s a result of seeing his brother be shot dead, [he] suffered serious emotional distress, including but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame." SAC, at ¶ 74. He further alleges that the Defendants' conduct, "which includes shooting and killing Stephen, was a substantial factor in causing [Johnny] serious emotional distress." *Id.* at ¶ 75. Defendants filed with their instant motion Peter Thompson's declaration, including an evidentiary exhibit with a DVD recording of an interview with Johnny made by KCSD detectives on November 17, 2012, following the incident. *See* Doc. 69-9, Ex. 2. The video evidence shows the moment when KCSD detectives told Johnny, after a long interview, that his brother died as a result of the officer-involved shooting. A jury could find that this record evidence substantiates Johnny's contention that he suffered serious emotional distress and that it directly arose from his experience during the fatal shooting of his brother. Although the record is thin, it is sufficient to put the matter in genuine dispute.

### D. California Civil Code 52.1 (Seventh Cause of Action)

Plaintiffs' seventh cause of action arises under California Civil Code section 52.1 ("the Bane Act"). The Bane Act authorizes individual civil actions for damages and injunctive relief by individuals whose federal or state rights have been interfered with by threats, intimidation, or

59

coercion. *See* Cal. Civ.Code § 52.1(a) (proscribing interference "by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state ..."); *see also Jones v. Kmart Corp.,* 17 Cal.4th 329, 338 (1998) (California Supreme Court equates "interferes" with "violates").

Defendants contend that Plaintiffs offer no evidence that Defendants interfered with or attempted to interfere with Stephen's constitutional rights by threatening or committing violent acts. *See* Doc. 69-1, at 22:24-25. Defendants argue that Plaintiffs' claim omits the requisite showing of "coercion independent from the inherent coercion in the wrongful detention itself." Doc. 69-1, at 22:15-17 (citing *Shoyoye v. County of Los Angeles,* 203 Cal. App. 4th 947 (2012)). Defendants again argue that the force used against Stephen was reasonable. *Id.* at 22:25-26.

However, this Court has found that if a plaintiff makes factual allegations showing a constitutional violation based on excessive force, a plaintiff need not, in addition, introduce independent evidence showing threats, intimidation, or coercion. *See, e.g.*, *Rodriguez v. City of Modesto*, No. 1:10-CV-01370-LJO, 2015 WL 1565354, at *22 (E.D. Cal. Apr. 8, 2015) (citing *Akey,* 2015 WL 1291436, at *10; *Johnson v. Shasta Cnty.,* No. 14-01338-KJM-EFB, 2015 WL 75245, at *13 (E.D. Cal. Jan. 6, 2015) ("Where Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force.") (quoting *Dillman v. Tuolumne Cnty.,* No. 13-CV-00404-LJO, 2013 WL 1907379, at *21 (E.D. Cal. May 7, 2013)); *see also Sangraal v. City & Cnty. of San Francisco,* 2013 WL 3187384, at *9 (N.D. Cal. June 21, 2013).

Considering Plaintiffs' factual allegations, the Court found that Plaintiffs present triable issues of fact on their excessive force claim; that the parties dispute whether Stephen presented an immediate threat; and, whether the officers provoked the violent confrontation. Consequently, the genuine issues of material facts similarly impact the resolution of the seventh cause of action and

result in the same outcome. As resolution of the disputed facts calls for a measure of fact-finding, summary judgment is inappropriate.

## IV.   PUNITIVE DAMAGES

Plaintiffs contend that Defendants' conduct warrants punitive damages. Defendants argue that no evidence exists to support such an award.

Punitive damages may be assessed in section 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, **or** when it involves reckless or callous indifference to the federally protected rights of others." *Castro v. Cnty. of Los Angeles*, -- F.3d --, 2015 WL 4731366, at *10-11 (9th Cir. Aug. 11, 2015) (emphasis added) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)). "[T]his threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness," *Smith*, 461 U.S. at 56, because to award punitive damages, the jury must make both a factual determination that the threshold was met and "a moral judgment" that further punishment was warranted, *id.* at 52-53 (recognizing that where the underlying standard of liability is recklessness, a tortfeasor may be subject to both compensatory and punitive damages without any additional culpable conduct). Determining whether to impose these sanctions is "within the exclusive province of the jury." *Castro*, 2015 WL 4731366, at *10-11 (quoting *Runge v. Lee,* 441 F.2d 579, 584 (9th Cir. 1971)).

The Court finds no evidence in the record that Defendants' conduct was motivated by an evil motive or intent. However, the standard is in the disjunctive, thus, Plaintiffs need only show that Defendants' conduct involved "deliberate indifference" or "reckless or callous indifference" to Stephen's constitutional rights to obtain punitive damages.[10] *Castro*, 2015 WL 4731366, at *10-11. The Court has discussed at length that Plaintiffs present triable issues of fact whether Defendants'

---

[10] The Ninth Circuit recently noted that:

The precise distinction between "deliberate indifference" and "reckless or callous indifference" remains an open question. []"[D]eliberate indifference" is defined in this circuit as "the conscious choice to disregard the consequences of one's acts or omissions." *See* 9th Cir. Civ. Jury Instr. 9.7 (2007). Furthermore, when the Supreme Court articulated the deliberate-indifference standard for failure-to-protect claims in *Farmer*, it defined the standard as one of criminal recklessness. *See Farmer,* 511 U.S. at 837-39, 114 S.Ct. 1970. The circular nature of these definitions gives rise to the inference that the terms are synonymous. Juries in these cases thus have the discretion to impose punitive damages if they believe further punishment above and beyond compensatory damages is appropriate, without having to make any additional factual findings. *See Smith,* 461 U.S. at 56, 103 S.Ct. 1625.

*Id.* at *11.

conduct was unreasonable. On the same record evidence, a jury could similarly determine that Defendants were deliberately indifferent or reckless. On this evidence, punitive damages are the exclusive province of the jury to decide.

## V.   DOE DEFENDANTS

The parties do not acknowledge that Defendants Does 1-50 remain, although the parties have had ample time in which to engage in discovery. *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (finding that "the plaintiff should be given an opportunity through discovery to identify the unknown defendants."). At this late stage, post-discovery, Plaintiffs have neither named additional defendants – presumably additional officers – nor have they offered arguments or evidence indicating liability against such officers based on the facts alleged in the SAC. As there is no provision in the Federal Rules of Civil Procedure permitting the use of fictitious defendants, the Court, *sua sponte*, will grant summary judgment in their favor and dismiss the remaining Doe Defendants in advance of the imminent trial. *See Fifty Assocs. v. Prudential Ins. Co. of Am.*, 446 F.2d 1187, 1191 (9th Cir. 1970); *see also Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 803 (9th Cir. 1995) (affirming district court's grant of summary judgment in favor of non-appearing defendant).

## VI.   CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 69) is **GRANTED IN PART** and **DENIED IN PART**, as follows: it is **GRANTED** insofar as Plaintiffs' Section 1983 substantive due process claim (the fourth cause of action); insofar as Defendants Does 1-50, the motion is **GRANTED** in its entirety, and such Defendants are dismissed; Defendants' motion is otherwise **DENIED**.


IT IS SO ORDERED.

Dated:  __September 14, 2015__          _____/s/ Lawrence J. O'Neill_
                                        UNITED STATES DISTRICT JUDGE